AMARILLO–BORGER EXPRESS,
Inc., et al.

v.

UNITED STATES of America.

Civ. A. 6289.

United States District Court
N. D. Texas, Dallas Division.

Jan. 24, 1956.

412

Ralph W. Currie, Dallas, Tex., for complainants, Amarillo-Borger Express Co. and others.

William R. McDowell, Dallas, Tex., for intervenor, Southwestern Railroads.

Stanley N. Barnes, Asst. Atty. Gen., Heard L. Floore, U. S. Atty., Fort Worth, Tex., John C. Ford, Asst. U. S. Atty., Dallas, Tex., James E. Kilday, Albert Parker, Attys., Dept. of Justice, Earl E. Pollock, Washington, D. C., for the United States.

Robert W. Ginnane, Gen. Counsel, I.C.C., Washington, D. C., Bernard H. English, Atty., I.C.C., Fort Worth, Tex., H. Neil Garson, Attys., Carroll T. Prince, Jr., I.C.C., Washington, D. C., for Interstate Commerce Commission.

Before BROWN, Circuit Judge, and ATWELL and ESTES, District Judges.

BROWN, Circuit Judge.

This is another skirmish in the running battle over freight rates for transportation of carbon black from the Southwestern area to the industrial area in the East. The precise question presented is whether the Interstate Commerce Commission's action in vacating a prior suspension of proposed rail rates was proper and, preliminary to that, whether such Commission act is reviewable at all.[1] We hold that it is, and that the action was improper.

Carbon black is an important product of natural gas. Consequently, the principal production is in that portion of United States known in the traffic world as the Southwestern area. With extensive natural gas activities, Texas is a leading producer. The principal consumers are the manufacturers of rubber goods, primarily automobile tires, one of the chief and typical consuming points being Akron, Ohio. Transportation of carbon black by Motor Carriers is important to them as it furnishes a substantial tonnage for movement from the Southwest to the Ohio area which would otherwise be a dead haul since the predominant long haul Motor Carrier traffic moves to the Southwest. Until 1954, the rates were apparently competitive between rail and motor carriers.

The controversy, of which the present action is the latest part, originated in 1954. Translating the problem from abstract concepts into a typical illustration of the operation of the rates better demonstrates the significance of the actions taken and its vital importance in the economic existence of complainants. A typical illustration on which there is no dispute is the rate from points in the Texas Panhandle to Akron, Ohio. The pre-1954 rate for motor carrier was $1.53 per cwt.; the rail rate was approximately $1.56 cwt. The slight difference, we are told, was in the operation of the blanket general increases.

In the early part of 1954, the rail carriers published certain schedules which established a substantial differential in their favor below motor carrier rates. The rail rate which had been $1.56 was reduced to $1.4785 cwt. The differential was then 5.15 cents below the motor carrier rate ($1.53). These schedules were permitted to become effective.

Thereafter, the motor carriers (which included the complainants here) filed schedules which, they asserted, were designed to meet this new scale and restore the competitive parity which had formerly existed. However, upon the filing of these schedules, the competing rail carriers petitioned the Interstate Commerce Commission to suspend them, and this was done. The Commission ordered an investigation of these proposed motor carrier rates which it had suspended. This hearing was held in July 1954. The Trial Examiner, upon hearing and consideration, filed a report in which he recommended that the Commission find that the motor carriers' reduction in rates was justified and lawful. The rail carriers, as permitted under the practice of the Commission, filed Exceptions to the Report, and the matter is now pending undecided before the Commission. There is no indication before us concerning the reasons for this delay or the time in which final decision is likely.[2] The seven months' statutory period, 49 U.S.C.A. § 15(7), for suspension expired, but in accordance with the administrative practice followed generally, the period of suspension was extended until

1. The complaint filed by interested Motor Carriers is for review by statutory three-judge court, 28 U.S.C.A. §§ 1336, 1398, 2284, 2321 to 2325.

2. After decision by the appropriate Division, the rules permit a petition for rehearing and consideration before the full Commission, a procedure which, with further briefs, inevitably involves many months' time; and, upon completion of Commission review, interested parties can precipitate judicial review. If the past is any guide, it is improbable that a final decision would be achieved under a year.

the matter was finally determined,[3] the effect of which is to freeze the motor carrier rates at their pre-1954 level ($1.-53 cwt.).

Notwithstanding the fact that the rail carriers through this situation were enjoying a 5.15 cents differential, they filed tariffs to become effective September 24, 1955, to establish a new schedule of rates substantially below their earlier reduced scale. For the typical movement, the proposed rate was $1.33 compared to the rail's 1954 rate of $1.4785, and the motor carriers' frozen rate of $1.53.

Through their authorized freight bureaus, the motor carriers, including Complainants, filed petitions with the Commission requesting the Commission to suspend the proposed schedules because they were unlawful, would result in rates and charges which would be unjust and unreasonable and constitute unfair and destructive competition contrary to the National Transportation Policy. Replies were filed by interested parties, including the railroads. In a conference hearing September 21, 1955, the Suspension Board[4] declined to suspend. On September 23, 1955, Division 2, acting as an Appellate Division on suspension matters, issued its order suspending the proposed schedules and directing an investigation. The significant portion of this order[5] states:

"*And it further appearing*, That upon consideration of the said schedules and protests thereto there is reason to believe that they would, if permitted to become effective, result in rates and charges, rules, regulations or practices which would be unjust and unreasonable in violation of the Interstate Commerce Act and constitute unfair and destructive competitive practices in contravention of the National Transportation Policy; and good cause appearing therefor:"

Petitions for reconsideration by rail carriers and certain shippers were filed, and on November 14, 1955, Division 2 vacated[6] its prior order of suspension.

3. Apparently out of recognition of the physical impossibility of the Commission rendering a decision in these complex matters without adequate hearings, opportunity for preparation of constructive briefs, the submission and argument of interested parties and time for consideration and decision—a process which can seldom be done in seven months—it appears to be the universal practice of all regulated carriers concerned to agree to the continuation of a suspension once issued. On argument here, counsel for both rail and motor carriers assumed that this time-honored practice would be followed if, by our action, the prior suspension order was reinstated. Consequently, the matter goes way beyond April 23, 1956.

4. A board of Commission employees established for the purpose of handling suspension matters pursuant to 49 U.S.C.A. § 17(2), § 7.3, 20 F.R. 5031–5035, July 14, 1955.

5. Investigation and suspension docket No. 6476 Carbon Black—Southwest to U.S.A. & Canada

"*It appearing*, That there have been filed with the Interstate Commerce Commission tariff schedules setting forth new reduced rates and charges, and new rules, regulations and practices affecting such rates and charges, applicable on interstate or foreign commerce, to become effective September 24, 1955, and later, designated as follows:"

[Railroad tariffs are described]

[then follows paragraph quoted in text above]

"*It is ordered*, That an investigation be, and it is hereby, instituted into and concerning the lawfulness of the rates, charges and regulations contained in such schedules, with a view to making such findings and orders in the premise as the facts and circumstances shall warrant.

"*It is further ordered*, That the operation of the said schedules be and it hereby is suspended, and that the use thereof on interstate and foreign commerce be deferred to and including April 23, 1956, unless otherwise ordered by this Commission."

6. "*It appearing*, That by an order dated September 23, 1955, the Commission, Division 2, acting as an appellate division, entered upon an investigation concerning the lawfulness of certain rates and charges and the regulations and

The only "finding" by the Commission [7] was:

"*It further appearing*, That consideration has been given to petitions of the respondents requesting vacation of the order of suspension, and to replies thereto, and good cause appearing therefor:"

The result of these administrative proceedings is that motor carriers because of the railroads' successful petitions for suspension are bound by their pre-1954 rates, while the railroads compete for this traffic at drastically reduced rates during the many months ahead when the lawfulness of these rail rates is under review.[8]

By motion and defense the Commission, the United States, and intervening railroads assert that the matter is beyond the power of review by this court. because the granting or denial of a suspension is a matter committed wholly to the Interstate Commerce Commission; that complainants have failed to exhaust their administrative remedies and, in any case, even though the order vacating suspension was illegal,[9] both court and

---

practices stated in schedules designated therein, and suspended the operation of the said schedules to and including April 23, 1956;

"*It further appearing*, That consideration has been given to petitions of the respondents requesting vacation of the order of suspension, and to replies thereto, and good cause appearing therefor:

"*It is ordered*, That the said order of September 23, 1955, be, and the same is hereby, vacated and set aside as of November 24, 1955, insofar as it suspended the operation of the schedules designated therein, but that the proceeding of investigation of said schedules shall continue in full force and effect."

7. By Order November 23, 1955, the full Commission denied the petition of motor carriers to waive their rule according administrative finality to suspension orders of Division 2, to stay the effectiveness of the order of November 14 and assign the whole matter for argument before the full Commission. The action under review, therefore, is that of the Commission, and not just a Division thereof.

8. While the order of suspension September 23, 1955, was still effective, the Commission November 1, 1955, set the hearings on the investigation phase November 29, 1955, at Dallas. November 16, two days after the vacation of suspension, the Commission postponed indefinitely the hearings scheduled for November 29. The hearings are now scheduled to commence February 2, 1956.

9. The suggestion was also made that complainants showed no irreparable injury entitling them to an injunction. Since, as competing carriers, they are clearly an aggrieved party entitled to complain of Commission action, Alton R. Co. v. United States, 315 U.S. 15, 62 S.Ct. 432, 86 L.Ed. 586; Chicago, St. P., M. & O. R. Co. v. United States, D.C.Minn., 50

F.Supp. 249, affirmed 322 U.S. 1, 64 S.Ct. 842, 88 L.Ed. 1093; cf. Federal Communications Commission v. Sanders Bros. Radio Station, 309 U.S. 470, 642, 60 S.Ct. 693, 84 L.Ed. 869, 1037; Interstate Commerce Commission v. Oregon-Washington R. & Nav. Co., 288 U.S. 14, 25, 53 S.Ct. 266, 77 L.Ed. 588, 596; American President Lines v. Federal Maritime Board, D.C.D.C., 112 F.Supp. 346, 349, it is our view that if, as we hold, the action is found to be "(1) not in accordance with law * * * (4) without observance of procedure required by law", § 1009(e), Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., it is the duty of the court to set it aside and a complainant who qualifies as a statutory "aggrieved person" need not further show that he will suffer a specific dollar loss for unlawful action of a governmental agency. In any case, by suggestion of the Court on hearing and agreement of counsel, affidavits and counteraffidavits were filed in lieu of oral testimony upon which we find, as a fact, that the movement of carbon black from the Southwestern area to the Eastern part of the United States is an important, vital part of complainants' business, producing substantial revenues which, in all likelihood will be substantially reduced in view of the widespread differentials in favor of railroad transportation. Complainants had already received letters and similar inquiries from shippers and similar trade representatives inquiring what steps were to be taken to meet the rail competition after vacation of the suspension order. The rail's action in successfully obtaining suspension of the motor carriers' 1954 schedules manifests the carrier approach to the dominant significance of the differential in rates as the principal basis for traffic diversion. And, of course, by its order of September 23, the Commission found the probability of destructive competition.

Commission are powerless to suspend the rail schedules which have thus become effective or reinstate the prior rates.

As the economic consequence of the Commission's action, if wrong, is so adverse we must be certain that the administrative processes which produce this result comply with the spirit and the rules of law.

■ In this approach, we do not, as the defendants fear we must, substitute ourselves for the Commission or pass judgment, at this time, upon the intrinsic merits of the question of the lawfulness or unlawfulness of the rail tariffs or the ultimate granting or denial of a suspension. Ours is the important, but much narrower, inquiry: under the circumstances presented here, was the action of the Commission in vacating the suspension lawful and proper? [10]

■ Of course, at the bottom, is the fact that a suspension order was issued on a finding of dominant significance. The order stated in categorical terms that, upon the record then before the Suspension Board and Division 2, on appeal, there was, "reason to believe that they [rates] would, if permitted to become effective, result in rates and charges, rules, regulations or practices which would be unjust and unreasonable in violation of the * * * act and constitute unfair and destructive competitive practices in contravention of the National Transportation Policy." These are plain, emphatic words of strong meaning. Of course, neither the United States nor the Commission can assert that such virile language must be disregarded as routine, stereotyped bureaucratic formulae for the Commission was under a dual [11] statutory obligation ade-

---

10. The action we review is not the failure of the Commission to suspend, nor are we confronted with the question of reviewability, or extent thereof, of Commission action, taken with proper regard to substantive and procedural requirements, declining to suspend proposed rates, such as that involved in the cases pressed on us so heavily by defendants: Carlsen v. United States, D.C.S.D.N.Y. (three-Judge), 107 F.Supp. 398; Algoma Coal & Coke Co. v. United States, D.C. Va.1935 (three-Judge), 11 F.Supp. 487; M. C. Kiser Co. v. Central of Georgia Ry., D.C.Ga., 236 F. 573, affirmed 5 Cir., 239 F. 718; Manhattan Transit Co., Inc., v. United States, D.C.Mass. (three-Judge), 24 F.Supp. 174; National Water Carriers Association v. United States, D.C.S.D.N.Y. (three-Judge), 126 F.Supp. 87; Merchant Truckmen's Bureau of New York v. United States, D.C.S.D. N.Y., 16 F.Supp. 998. In some, it must be recognized, language so sweeping is used that, if followed literally, would put suspension actions by the Commission beyond the pale, a concept wholly out of harmony with the moving spirit of the Administrative Procedure Act and the underlying force of Judge Hutcheson's opinion, Ferguson-Steere Motor Co. v. United States, D.C.N.D.Tex.1954, (three-Judge), 126 F.Supp. 588, 591, that such orders, as other Commission action, are subject to judicial scrutiny to determine legality and whether administrative discretion was exercised at all, and if so, whether abused.

11. The first is in § 15(7) of the Interstate Commerce Act, 49 U.S.C.A. § 15 (7):

"Whenever there shall be filed with the commission any schedule stating a new * * *, fare, or charge, or any new * * *, or any new * * * regulation or practice affecting any rate, fare, or charge, the commission shall have, and it is hereby given, authority, either upon complaint or upon its own initiative without complaint, at once, * * *, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, fare, * * *, or practice; and pending such hearing and the decision thereon the commission, upon filing with such schedule and delivering to the carrier or carriers affected thereby a *statement in writing of its reasons* for such suspension, may from time to time *suspend* the operation of such schedule and defer the use of such rate, fare, * * *, but not for a longer period than seven months beyond the time when it would otherwise go into effect; * *. At any hearing involving a change in a rate, fare, * * *, the burden of proof shall be upon *the carrier to show* that the proposed changed rate, fare, * * * is just and reasonable, * * *." (Emphasis supplied.)

The second is in the Administrative Procedure Act, § 8, 5 U.S.C.A. § 1007:

"* * * All decisions (including initial, recommended, or tentative decisions) shall become part of the record and in-

quately to state its reasons for the suspension order. Since all reviewing courts are admonished, and we are here through specific citation in the briefs before us, to accord to Commission action a presumption of legality, United States v. Chemical Foundation, 272 U.S. 1, 14, 15, 47 S.Ct. 1, 71 L.Ed. 131; Baltimore & O. R. Co. v. United States, 298 U.S. 349, 358, 360, 56 S.Ct. 797, 80 L.Ed. 1209; Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333, we think that all parties were entitled to take this for its face value as a deliberate, responsible, articulate finding that the proposed rates would produce these results which, contravening the National Transportation Policy, would be destructive of a sound system of national transport, Act September 18, 1940, c. 722, Title I, § 1, 54 Stat. 899, 49 U.S.C.A. § 1001 note.

But these findings, decisive and significant in nature, made in scrupulous regard for statutory mandate were, by the order of vacation, swept away without the slightest indication of the existence of facts, an adequate description of them, or even the barest statement of reasons underlying the Commission's change of heart. The propriety of its action, on the external record, must be tested under the simple, brief phrase, "and good cause appearing therefor." [12]

█ If the cryptic phrase "good cause appearing" is a sufficient indication of action, it will be a self-generating bar to any review since, "the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based", Securities and Exchange Commission v. Chenery Corp.,

318 U.S. 80, 63 S.Ct. 454, 459, 87 L.Ed. 626. It is precisely because the scope of judicial review is so narrowly limited, that administrative agencies must, in terms beyond the statutory rubric, reveal the basis for their action by which to judge whether it has met the elemental standards of our system and statutory requirements. A threshold decision by reviewing court therefore is whether there is a "lack of the basic or essential findings required to support the Commission's order", State of Florida v. United States, 282 U.S. 194, 215, 51 S.Ct. 119, 125, 75 L.Ed. 291; United States v. Baltimore & O. R. Co., 293 U.S. 454, 465, 55 S.Ct. 268, 79 L.Ed. 587; Alabama Great Southern R. Co. v. United States, 340 U.S. 216, 224, 71 S.Ct. 264, 95 L.Ed. 225; Cantlay & Tanzola, Inc., v. United States, D.C.S.D.Cal. (three-Judge), 115 F.Supp. 72; State of North Carolina v. United States, 325 U.S. 507, 65 S.Ct. 1260, 89 L.Ed. 1760; Atlanta & St. Andrews Bay Ry. Co. v. United States, D.C., 104 F.Supp. 193; Pacific Island Tariff Bureau v. United States, D.C., 129 F.Supp. 472.

█ Moreover, this requirement has now been made explicit by the Administrative Procedure Act, 5 U.S.C.A. § 1007 (b), which requires a statement of findings and conclusions in their ultimate legal form "as well as the reasons or basis therefor." Conceding, as they must, that under Riss & Co., Inc., v. United States, 341 U.S. 907, 71 S.Ct. 620, 95 L.Ed. 1345, the Commission is subject to the Administrative Procedure Act, the United States and the Commission seek to escape its impact in suspension matters on the theory that, since suspen-

clude a statement of (1) findings and conclusions, *as well as the reasons or basis therefor*, upon all the material issues of fact, law, or discretion presented on the record; * * *." (Emphasis supplied.)

12. The second and significant paragraph of the order read: "It further appearing, that consideration has been given to

the petitions of the respondents [railroads and some shippers] requesting vacation of the order of suspension, and to replies thereto, and good cause appearing therefor;" Obviously the fact that railroads requested vacation of the order would not be a good ground; nor, as contended by Complainants, do we think that the Commission meant that.

**418**

sion is a matter committed to the discretion of the Commission, it is specifically excepted under Section 1009:

"§ 1009. Except so far as (1) statutes preclude judicial review or (2) agency action is by law committed to agency discretion.

"(a) Any person * * * adversely affected or aggrieved * * *, shall be entitled to judicial review thereof."

Starting with Board of Railroad Commissioners of State of North Dakota v. Great Northern R. Co., 281 U.S. 412, 50 S.Ct. 391, 396, 74 L.Ed. 396, which, describing the statutory background of present Section 15(7) concerning suspensions, states, "This power of suspension was intrusted to the Commission only", and relying heavily on Carlsen, Algoma Coal, Kiser, Manhattan Transit Co., and others cited footnote 10, supra, holding that a refusal to suspend is not subject to review, defendants argue that this administrative judgment exempts

the whole field from the requirements of the Administrative Procedure Act.

 A proper regard for the whole reach of the Administrative Procedure Act and its long legislative history will not support an argument which would automatically remove from its protection substantially every administrative agency to whom was entrusted judgment and discretion in its administrative decision. This language was used to assure that judicial review would not be contrived where it was plain that none was intended, and where the action under inquiry was one wholly within the right of the agency to grant or refuse, allow or deny, with no statutory or similar standard established upon which to base its action. But the exercise of discretion, the making of judgments, and the issuance of sanctions, 5 U.S.C.A. § 1001(f), upon the basis of administrative expertise are precisely the matters which Congress in this important legislation intended should be under, not exempt from, the Administrative Procedure Act.[13]

13. The following references to legislative history are found (on pages indicates) in Senate Document No. 258, 79th Congress, Second Session, Administrative Procedure Act, Legislative History:

Report of the Committee on the Judiciary (Report No. 752) at page 212:

"Sec. 10. [now § 1009] Judicial Review—*Section 10 on judicial review does not apply in any situation so far as there are involved matters with respect to which statutes preclude judicial review or agency action is by law committed to agency discretion.*

"Very rarely do statutes withhold judicial review. It has never been the policy of Congress to prevent the administration of its own statutes from being judicially confined to the scope of authority granted or to the objectives specified. Its policy could not be otherwise, for in such a case statutes would in effect be blank checks drawn to the credit of some administrative officer or board.

"The basic exception of matters committed to agency discretion would apply even if not stated at the outset. If, for example, statutes are drawn in such broad terms that in a given case there is no law to apply, courts of course have no statutory question to review. That

situation cannot be remedied by an administrative procedure act but must be treated by the revision of statutes conferring administrative powers. However, where statutory standards, definitions, or other grants of power deny or require action in given situations or confine an agency within limits as required by the Constitution, then the determination of the facts does not lie in agency discretion but must be supported by either the administrative or judicial record."

Committee on the Judiciary, House of Representatives, (House Report No. 1980), page 275, 276:

"Section 10. * * * [heading same as Senate Committee Report]

"This section requires adequate, fair, effective, complete, and just determination of the rights of any person in properly invoked proceedings.

" * * * [Here follows first paragraph of Senate Committee Report quoted above] The statutes of Congress are not merely advisory when they relate to administrative agencies, any more than in other cases. To preclude judicial review under this bill a statute, if not specific in withholding such review, must upon its face give clear and convincing evidence of an intent to withhold it. The mere failure to provide spe-

Consequently, we are of the clear opinion that whatever the ultimate scope of judicial review might be on a suspension matter, the Commission is obliged in all stages to respect the requirements, the letter and the spirit of the Administrative Procedure Act. Since both it and the general law concerning the sufficiency of Commission action require an adequate statement of the underlying reasons for the action, we think it evident that the order of vacation did not satisfy these requirements. This order vacating the prior one is a part of, and must be read with, it. All that it says is that "good cause appearing" the prior action is rescinded. If it is read as though it were meant to be a repeal, a withdrawal, and rescission of the findings that the rates would (1) be unjust, (2) unreasonable, (3) in violation of the Act, (4) constitute unfair destructive competition, and (5) contravene the National Transportation Policy, the record would yet be inadequate. We do not think the Commission can make serious findings of this nature and then, without more, announce that they no longer exist. The basic facts, the underlying reasons for that action, would require, as a minimum, some discussion of the factors leading the Commission intelligently and as a matter of deliberative judgment in good faith to contrary conclusions. If, as may be suggested by the order of November 14, the Commis-

cially by statute for judicial review is certainly no evidence of intent to withhold review.

"Matters of discretion are necessarily exempted from the section, since otherwise courts would in effect supersede agency functioning. But that does not mean that questions of law properly presented are withdrawn from reviewing courts. Where laws are so broadly drawn that agencies have large discretion, the situation cannot be remedied by an administrative procedure act but must be treated by the revision of statutes conferring administrative powers. However, where statutory standards, definitions, or other grants of power deny or require action in given situations or confine an agency within limits as required by the Constitution, then the determination of the facts does not lie in agency discretion but must be supported by either the administrative or judicial record. In any case the existence of discretion does not prevent a person from bringing a review action but merely prevents him *pro tanto* from prevailing therein."

And in debates in the Senate (Congressional Record March 12, May 24, 25, 27, 1946) during presentation by its distinquished sponsor Senator McCarran, page 310, 311:

"Mr. McCarran: I yield.

"Mr. Donnell: I should like to ask the distinguished Senator a question. Section 10 [now 5 U.S.C.A. 1009] of the bill recites in part that—

"Except so far as (1) statutes preclude judicial review or (2) agency action is by law committed to agency discretion—

"(a) Right of review: Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof.

"It has occurred to me the contention might be made by someone in undertaking to analyze this measure that in any case in which discretion is committed to an agency, there can be no judicial review of action taken by the agency. The point to which I request the Senator to direct his attention is this: In a case in which a person interested asserts that, although the agency does have a discretion vested in it by law, nevertheless there has been abuse of that discretion, is there any intention on the part of the framers of this bill to preclude a person who claims abuse of discretion from the right to have judicial review of the action so taken by the agency?

"Mr. McCarran: Mr. President, let me say, in answer to the able Senator that the thought uppermost in presenting this bill is that where an agency without authority or by caprice makes a decision, then it is subject to review.

\* \* \* \* \*

"Mr. Donnell: But the mere fact that a statute may vest discretion in an agency is not intended, by this bill, to preclude a party in interest from having a review in the event he claims there has been an abuse of that discretion. Is that correct?

"Mr. McCarran: It must not be an arbitrary discretion. It must be a judicial discretion; it must be a discretion based on sound reasoning."

sion felt that there was information contained in the petitions to vacate which justified or required the change in its conclusions, the Commission could easily have given sufficient elaboration of the file record to enable parties, counsel, and reviewing tribunals to determine whether this was the act of genuine judgment, deliberate discretion and reasonable decision, or whether it was hasty, ill-considered, precipitous action with no substantial basis for it.

■ What we have said is certainly correct if it is assumed that the Commission intended its cryptic phrase "good cause appearing" to wipe away all of its prior fact conclusions. It is all the more so if, as seems likely, the Commission intended that the balance of its order of September 23 calling for investigation of the rates to determine their lawfulness should remain in effect. In expressed terms the only change made by the subsequent order was to vacate the former so far as concerned suspension alone. It literally left in force the findings of unlawfulness, destructive competition, and then, without more than the magic phrase "good cause appearing", determined that what on September 23 led them to suspend now led them to unsuspend. The Commission may, as any other body, have the right to change its mind, but its action must demonstrate the "reasons or basis therefor."

■ We are equally of the clear opinion that Complainants have the right to challenge and the court has the power to nullify action so illegal and having such immediate and irreparable consequences. Unless the rates are suspended, the Complainants have no protection against this competition until such time as the Commission's decision has become final on the basic investigation or on a complaint under Section 13, 49 U.S.C.A. § 13. But under the statutory scheme of Section 15(7), rates can be suspended only within thirty days and then not for a time beyond seven months. If, as we hold it was, the act of the Commission in vacating the prior suspension was illegal, the only possible way for Complainants to secure the benefit of that suspension or to eradicate the devastating consequences of an unlawful vacation of it, was by an immediate appeal and injunction. In this sense it was no routine, administrative interim action but was truly final in form and effect; once gone, it was irretrievable. There was thus no further administrative machinery or procedure available—much less to be exhausted. Utah Fuel Co. v. National Bituminous Coal Commission, 306 U.S. 56, 59 S.Ct. 409, 83 L.Ed. 483; Isbrandtsen Co. v. United States, 93 U.S.App.D.C. 293, 211 F.2d 51; see also opinion of Mr. Justice Douglas, as Circuit Justice, Stanard v. Olesen, 74 S.Ct. 768, 98 L.Ed. 1151. If the Commission act is allowed to stand, the right to a suspension is forever gone until, months or years later, a decision of the Commission on basic unlawfulness or unreasonableness of the rates becomes final and effective. Complainants may succeed in the investigation proceeding soon to commence, but grinding, as it must, slowly through inevitable judicial review, the motor carriers will have no relief for the traffic which they have lost, diverted to rails, during this long period of time.[14] We do not mean to say that Complainants are entitled to a suspension; but when one has validly issued it can be rescinded only by lawful methods.

■ Nor can this situation which makes judicial relief from administrative error imperative be turned, as defendants attempt, into the argument that such relief should be denied because the Commission is now powerless to suspend

14. The provision in § 15(7), footnote 11 supra, for protection of shippers after the expiration of the seven months' statutory period of suspension is of no help to competing carriers adversely affected since this relates only to "proposed *increased*" rates, and the requirement to keep accurate records and make refunds of excess payments received in the interim is limited to "the persons in whose behalf such amounts were paid."

rates once they are in effect. We can assume that by virtue of Sections 6(3), 15(1) and 15(7) of the Act, 49 U.S.C.A. §§ 6(3), 15(1), 15(7), that suspension must be ordered within thirty days of the initial filing, and where once allowed to become effective from the absence of a suspension order, the Commission cannot thereafter suspend. Skinner & Eddy Corp. v. United States, 249 U.S. 557, 39 S.Ct. 375, 63 L.Ed. 772. But no such thing occurred here. Here, before the rates became effective, a valid suspension order was issued. On the record this suspension order was vacated, but, for the reasons we have detailed, this action was contrary to law. The power of the Commission to continue a suspension validly made (until validly set aside) cannot be altered by illegal action, nor can the carrier (here the rails) upon whose petition the illegal action was taken, assert that their rights to put into effect tariff rates shall be the same as though no such administrative action had taken place. Once the order of November 14 is expunged, the matter is remitted to the situation existing immediately prior to its entry: The rates were then under valid suspension. The power of the Commission does not exhaust itself through its own errors. If it were so, the law would indeed be a strait jacket.

It follows, therefore, that the order of November 14, 1955, vacating the suspension must be declared void, an injunction against its enforcement issued, and the proceedings remanded to the Commission for further and not inconsistent proceedings as though the order had never been made. To effectuate the holding herein, the injunction will forbid the use or application of tariff [15] rates and schedules which became, or were allowed to become, effective by reason of the vacation of the prior suspension order of September 23, 1955, until such time as the order of September 23, 1955, shall have been rescinded or modified by lawful action of the Commission.

Judgment for Plaintiff. Remanded to the Commission.

---

15. Subsequent to November 14, 1955, the railroads filed Supplement 170, published as a new tariff schedule, effective December 31, 1955, but which is, they state, the equivalent of, and restores, the schedules suspended September 23.