**DIXIE CARRIERS, Inc., Gulf-Canal Lines, Inc., Mississippi Valley Barge Line Company, American Barge Line Company, Union Barge Line Corporation, John I. Hay Company, Coyle Lines Incorporated, Federal Barge Lines, Inc., Waterways Freight Bureau, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. 9544.

United States District Court
S. D. Texas, Houston Division.

July 31, 1956.

Donald Macleay, Harry C. Ames, Jr., Washington, D. C., Alan S. Dale, Houston, Tex., on the brief, Nuel D. Belnap, Belnap & McAuliffe, Chicago, Ill., T. S. Christopher, Christopher & Bailey, Fort Worth, Tex., Ames, Hill & Ames, Washington, D. C., Francis W. McInerny, Macleay, Lynch & MacDonald, Washington, D. C., Eastham, Hinds & Dale, Houston, Tex., for plaintiffs.

John C. Ridley, Houston, Tex., Harvey Huston, Richard J. Murphy, Chicago, Ill., Palmer Hutcheson, Jr., Houston, Tex., on the brief, Edwin N. Bell, Baker, Botts, Andrews & Shepherd, Houston, Tex., Harry E. Boe, Chicago, Ill., Robert G. Boes, Cleveland, Ohio, J. T. Clark, Cleveland, Ohio, William E. Davis, Kansas City, Mo., William R. McDowell, Dallas, Tex., Walter G. Treanor, St. Louis, Mo., Robert H. Bierma, Chicago, Ill., Ralph M. Buzek, Cincinnati, Ohio, Hutcheson, Taliaferro & Hutcheson, Houston, Tex., for intervenor Railroad Carriers.

John H. Earle, Atty., Dept. of Justice, Washington, D. C., Gordon Kroll, Asst. U. S. Atty., Houston, Tex., on the brief, Stanley Barnes, Asst. Atty. Gen., Malcolm R. Wilkey, U. S. Atty., Houston, Tex., for the United States.

H. Neil Garson, Asst. Gen. Counsel, Interstate Commerce Commission, Washington, D. C., Robert W. Ginnane, General Counsel, Interstate Commerce Commission, Washington, D. C., on the brief for defendant, Interstate Commerce Comm.

Before JOHN R. BROWN, Circuit Judge, HANNAY, Chief Judge, and INGRAHAM, District Judge.

JOHN R. BROWN, Circuit Judge.

Involving the vacating of an Order suspending proposed rates, this case [1] is a parallel of Amarillo-Borger Express v. United States, D.C.N.D.Tex., 138 F. Supp. 411 (three-Judge), and the variation in Long Island Railroad Co. v. United States, D.C.E.D.N.Y., 140 F. Supp. 823 (three-Judge), expressly approving it. We too, without the necessity of restating the matter so fully developed there, adopt the opinion, conclusion and reasoning of that case. The only substantial factual difference is that here the proposed rates required express Section Four approval by the Commission under the Long and Short Haul provision, 49 U.S.C.A. § 4(1) of the National Transportation Act, 49 U.S.C.A. § 1 et seq.

The Railroads, to regain a competitive position lost to interstate Water and Motor Carriers largely as the result, they claimed, of voluntary ex parte increases (Ex Parte 162, 166, 168, 175) in railroad rates, on September 19, 1955, published (to become effective October 26, 1955) drastic reductions in their rates for the movement of steel and wrought-iron pipe, in carloads, moving from the mills in the industrial areas East of the Mississippi River to destinations in the States of Arkansas, Louisiana, Oklahoma and Texas. Concealed in the lexicography of the complex tariff papers is the battle for transportation revenues running annually, it is asserted, from $6,000,000 to $9,000,000 and consti-

---

1. Complaint filed February 16, 1956, by eight specified, certificated Water Carriers and Waterways Freight Bureau to set aside orders of the Interstate Commerce Commission, 49 U.S.C.A. § 17(9); 28 U.S.C.A. §§ 1336, 1398, 2284, 2321 to 2325; and Section 10 of the Administrative Procedure Act, 5 U.S.C.A. § 1009.

tuting about 15% of water carrier revenues for the movement of fabricated steel pipe for current and immediate use in the oil fields and for pipeline transmission facilities in the great Southwest.

This case does not involve the question of the extent of the right, so often asserted by the Railroads, as a part of management responsibility, to publish reduced rates to meet competition, see Atlanta & St. Andrews Bay Ry. Co. v. United States, D.C.M.D.Ala., 104 F.Supp. 193, 198, and which would, subject only to the possibility of suspension for a seven months period under 49 U.S.C.A. § 15(7), make them effective until determined by hearing to be unlawful. For here, by the choice of the Railroads, the proposed rates were less for the longer distance from the steel mill areas to rail-head delivery points in the Southwest than rates for the movement of the same commodity for shorter distances within both origin and destination territories. They were thus confessedly in violation of the Act [2] *unless*, upon application and after investigation by the Commission, finding it to be a special case, and the rates reasonably compensatory for the services performed, express approval were given.

Consequently, as permitted by the Act, the Railroads simultaneously filed (September 19, 1955) Fourth Section Application No. 31120 for approval of the rates. But until the Fourth Section Application was granted, the rates could not go into effect. Conversely, so long as they were suspended, they could not be effective and approval under Fourth Section would be a sterile, useless academic decision.

Water and Motor Carriers then filed Protests against Fourth Section approval and Petitions for Suspension, each of which normally are administratively handled by separate Boards [3] of Commission employees. On October 20, 1955, the Suspension Board, on positive findings [4] identical with Amarillo-Borger,

---

2. Sec. 4 [as amended June 18, 1910, February 28, 1920, August 9, 1935, September 18, 1940], 49 U.S.C.A. § 4: "(1) It shall be unlawful for any common carrier subject to this part or Part III to charge or receive any greater compensation in the aggregate for the transportation of passengers, or of like kind of property, for a shorter than for a longer distance over the same line or route in the same direction, the shorter being included within the longer distance * * *: *Provided*, That upon application to the Commission such common carrier may in *special cases, after investigation*, be authorized by the Commission to charge less for longer than for shorter distances for the transportation of passengers or property; * * *, but in exercising the authority conferred upon it in this proviso the Commission shall not permit the establishment of any charge to or from the more distant point that is *not reasonably compensatory* for the service performed; * * *." [Italics supplied]

3. 49 U.S.C.A. § 17(2). The suspension proceeding was identified as I & S [Investigation and Suspension] Docket No. 6491. Fourth Section approval was under FSA 31120.

4. The Order October 20, 1955, in 6491

stated (numbers in [ ] added to identify stated reasons for action):

"*And it further appearing*, That upon consideration of the said schedules and protests thereto there is reason to believe that they would, if permitted to become effective, result in rates and charges, rules, regulations or practices which would be [1] unjust and unreasonable in violation of the Interstate Commerce Act and [2] constitute unfair and destructive competitive practices in contravention of the National Transportation Policy and [3] be in contravention of the provisions of section 4 of the Interstate Commerce Act, without appropriate authority * * *."

In two "corrected" orders later entered but bearing the same date occasioned by technical errors in tariff descriptions, the phrase "in contravention of the National Transportation Policy" was inadvertently omitted from finding [2] so that [2] read, "and constitute unfair and destructive competitive practices in contravention of the provisions of section 4 * * *."

The Railroads (see their brief pages 31, 32, footnote 1) find significance in this omission, but the last "corrected" order of December 7, 1955, entered March 2,

supra, ordered an investigation into the lawfulness of the rates and suspended them for the full seven months to May 25, 1956. With the rates suspended, there was nothing which the I & S Board could do on FSA 31120.

The Railroads, presumably accepting the findings, note 4, supra, as an adequate, articulate "statement in writing of [the Commission's] reasons for such suspension" [5] since no complaint by them has yet been made, filed on October 26, 1955, a Petition in I & S 6491 for reconsideration of the suspension order and, on the same day, filed in FSA 31120 a "Petition of Railroad Applicants for Immediate Issuance of the Authority

Sought by Application herein, dated September 16, 1955." This was not [6] a Petition for reconsideration and those preparing and proposing it treated it as a Petition for initial action on the original Fourth Section Application.

Through Commission administrative channels the Petition for Reconsideration of the Suspension Order came before Division 2 acting as an appellate division. On December 7, 1955, by an Order [7] in all respects identical with that roundly condemned in Amarillo-Borger, supra, the Suspension Order was vacated; and on December 9, 1955, an order of ambiguous [8] origin was entered grant-

---

1956, note 13, infra, restating the negative of findings [1], [2], and [3] completely dispels this.

5. 49 U.S.C.A. § 15(7): "Whenever there shall be filed with the Commission any schedule stating a new * * * rate * * * the commission shall have * * authority * * * to enter upon a hearing concerning the lawfulness of such rate * * *; and pending such hearing and the decision thereon the commission, upon * * * delivering to the * * * carriers affected thereby a statement in writing of its reasons for such suspension, may from time to time suspend the operation of such * * * rate * * * but not for a longer period than seven months beyond the time when it would otherwise go into effect * * *."

6. No Order of any kind was ever entered or served in FSA 31120 until the Order of December 9, 1955. While an undisclosed Minute Entry of the Fourth Section Board, 21 October 1955, states, "Voted to withhold relief pending hearing, and to assign the above application for hearing with I & S, No. 6491", it is of no consequence as no action was, or could then have been, taken and to be effective, it must have been communicated to interested parties affected by it, 49 U.S.C.A. §§ 14(1, 2), 17(5) ; 5 U.S.C.A. § 1002, which was not done.

The Railroads' Petition FSA 31120 itself reflects this: "As the Suspension Board suspended the involved rates, the question of issuing Fourth Section authority at this time became moot and the Fourth Section board has *neither granted nor denied* the Railroads' application. However, as a petition for vacation of the order of suspension is filed concurrently, the question is *revived* and

this petition is therefore filed * * *" [Emphasis supplied]

The Prayer stated: "Wherefor these applicants pray that this Commission issue appropriate Fourth Section authority sought by Fourth Section Application No. ICC 31120."; and compare this with the document filed simultaneously in I & S 6491, denominated a "Petition * * * for Reconsideration" and opens, "Come now the railroads in * * * I & S 6491 and petition this Honorable Commission for *reconsideration* of the Order of the Suspension Board * * *." [Emphasis supplied]

7. I & S 6491, December 7, 1955: *"It further appearing, That consideration has been given to a petition of the respondent requesting vacation of the order of suspension, and replies thereto; and good cause appearing therefor: * * *"* See note 6, Amarillo-Borger, 138 F.Supp. at pages 414, 415.

8. The actual order, made on December 9, as served December 29, 1955, showed at its heading: "At a session of the Interstate Commerce Commission, Division 2, acting as an Appellate Division * * *" but closed: "By the Commission, Fourth Section Board. Harold D. McCoy, Secretary."

A corrective order dated December 9, 1955, was entered March 2, 1956, after this case had been assigned to this Three-Judge Court. It deleted reference to the Fourth Section Board and substituted: "By the Commission, Division 2, acting as an Appellate Division."

By a still later order purporting to be entered December 16, 1955, but actually entered April 27, 1956, this was again changed by reciting that the order of December 9, 1955, was by Division 2 "act-

ing temporary Fourth Section relief effective December 17, 1955.

The Water and Motor Carriers then filed separate Petitions for Reconsideration of the Orders of December 7 and 9 requesting in those Petitions the Stay granted by the Act [9] where the initial Order is handed down by a Board or Division. By notice dated December 15, 1955, the full Commission declined to act and on the following day, December 16, notice and order were issued [10] denying the Petitions in I & S 6491.

Thus the matter stood when, on February 16, 1956, this verified complaint was filed. And on that record, we are of the clear opinion that the Order of December 7, vacating the prior suspension, is invalid. The simple phrase "and good cause appearing therefor" is inadequate to upset prior positive findings, and for the reasons [11] set forth in

ing as an Appellate Division, upon consideration of a petition by respondents requesting that the action of the Fourth Section Board in voting to withhold relief in Fourth Section application No. 31120, * * * be reversed * * *."

9. 49 U.S.C.A. § 17(8): "Where application for rehearing, reargument, or reconsideration of a decision, order, or requirement of a division, an individual Commissioner, or board is made in accordance with the provisions of this section and the rules and regulations of the Commission, and the decision, order, or requirement has not yet become effective, the decision, order, or requirement shall be stayed or postponed pending disposition of the matter by the Commission or appellate division; but otherwise the making of such an application shall not excuse any person for complying with or obeying the decision, order, or requirement, or operate to stay or postpone the enforcement thereof, without the special order of the Commission."

10. The notice, December 15, 1955, is captioned I & S 6491 and refers to "Petitions * * * seeking reconsideration * * * by the Commission of appellate action of Division 2 in which the Division modified the action of the Board of Suspension." This was merely a ruling that the Petitions would be considered by the appropriate appellate division pursuant to Item 8.4 Organization Minutes of the Commission 20 Fed.Reg. 5031, 5035, and Rule 101 (g).

The notice, December 16, and formal order of the same date likewise refer solely to I & S 6491 and the order, December 7, 1955, vacating the prior order, October 20, 1955, suspending the rates.

11. The Court summed it up this way 138 F.Supp. at pages 417 and 420:

"But these findings, decisive and significant in nature, made in scrupulous regard for statutory mandate were, by the order of vacation, swept away without the slightest indication of the existence of facts, an adequate description of them, or even the barest statement of reasons underlying the Commission's change of heart. The propriety of its action, on the external record, must be tested under the simple, brief phrase, 'and good cause appearing therefor.'

"If the cryptic phrase 'good cause appearing' is a sufficient indication of action, it will be a self-generating bar to any review since, 'the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based', Securities and Exchange Comm. v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 459, 87 L.Ed. 626. It is precisely because the scope of judicial review is so narrowly limited, that administrative agencies must, in terms beyond the statutory rubric, reveal the basis for their action by which to judge whether it has met the elemental standards of our system and statutory requirements. A threshold decision by reviewing court therefore is whether there is a 'lack of the basic or essential findings required to support the Commission's order', State of Florida v. United States, 282 U.S. 194, 215, 51 S.Ct. 119, 125, 75 L.Ed. 291; United States v. Baltimore & Ohio R. Co., 293 U.S. 454, 465, 55 S.Ct. 268, 79 L.Ed. 587; Alabama Great Southern R. Co. v. United States, 340 U.S. 216, 224, 71 S.Ct. 264, 95 L.Ed. 225; Cantlay & Tanzola, Inc., v. United States, D.C.S.D.Cal., 115 F.Supp. 72, (three-Judge); State of North Carolina v. United States, 325 U.S. 507, 65 S.Ct. 1260, 89 L.Ed. 1760; Atlanta & St. Andrews Bay Ry. Co. v. United States, D.C., 104 F.Supp. 193; Pacific Island Tariff Bureau v. United States, D.C., 129 F.Supp. 472. * * *

"What we have said is certainly correct if it is assumed that the Commission intended its cryptic phrase 'good cause appearing' to wipe away all of its prior fact conclusions. It is all the more so if, as seems likely, the Commission intended that the balance of its order of

Amarillo-Borger cannot, on judicial review,[12] stand.

 Nor, do we think, does the matter stand differently because of sub-

September 23 calling for investigation of the rates to determine their lawfulness should remain in effect. In expressed terms the only change made by the subsequent order was to vacate the former so far as concerned suspension alone. It literally left in force the findings of unlawfulness, destructive competition, and then, without more than the magic phrase 'good cause appearing', determined that what on September 23 led them to suspend now led them to unsuspend. The Commission may, as any other body, have the right to change its mind, but its action must demonstrate the 'reasons or basis therefor.'"

12. To similar attacks made here, as there, the following may be added to Amarillo-Borger's exposition:

(a) Competitors immediately, adversely and financially affected have standing to sue as parties for a review: note 9, Amarillo-Borger and Scripps-Howard Radio v. Federal Communications Commission, 316 U.S. 4, 14, 15, 62 S.Ct. 875, 86 L.Ed. 1229, 1236, 1237; National Coal Association v. Federal Power Commission, 89 U.S.App.D.C. 135, 191 F.2d 462, 464–466; Associated Industries of New York State v. Ickes, 2 Cir., 134 F. 2d 694, 699–704; Cia Mexicana de Gas v. Federal Power Commission, 5 Cir., 167 F.2d 804, 805.

(b) An Order vacating suspension has adequate finality for review: see, Amarillo-Borger, 138 F.Supp. at page 420, syllabus 10, 11; Atlantic Seaboard Corp. v. Federal Power Commission, 4 Cir., 201 F.2d 568; Phillips Petroleum Co. v. Federal Power Commission, 10 Cir., 227 F.2d 470; for reviewability is determined by the intrinsic nature of the order and its practical impact upon the business under regulation and not by the mere tag or label affixed to it; Columbia Broadcasting System v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563; Frozen Food Express v. United States, 351 U.S. 40, 76 S.Ct. 569; United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763.

(c) Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., applies to I.C.C. proceedings: Amarillo-Borger, supra, 138 F.Supp. at page 417; Coyle Lines v. United States, D.C.E.D.La., 115 F. Supp. 272, 275; Atlanta & Saint Andrews Bay Railway Co. v. United States, D.C., 104 F.Supp. 193, at page 200; Chicago & E. I. R. Co. v. United States, D.C. S.D.Ind., 107 F.Supp. 118, 124. Section 8, 5 U.S.C.A. § 1007 applies for suspen-

sions and temporary approval of Fourth Section applications are integral parts of investigations on the lawfulness of rates which must, of course, be determined upon hearings, see e. g., 49 U.S. C.A. § 15(1) "whenever, after full hearing * * *"; 15(7) "* * * the commission shall have * * * authority * * * to enter upon a hearing concerning the lawfulness * * *"; so that, while prescribing rates is so-called "rule making" under Section 1, 5 U.S.C.A. § 1001, the substantive statutes requiring the hearing thereby invoke Section 4, 5 U.S.C.A. § 1003(b) and Section 7, 5 U.S.C.A. § 1006. The Transportation Act likewise requires full adequate statement of Commission action, 49 U.S.C.A. §§ 14(1, 2), 17(5).

(d) That the granting or denial of suspensions requires the Commission to exercise sound judgment and discretion does not under Section 10, Administrative Procedure Act, 5 U.S.C.A. § 1009, class suspension orders as nonreviewable: Amarillo-Borger, supra, 138 F.Supp. at page 418, note 13; commenting on the legislative history (summarized note 13, Amarillo-Borger), the Supreme Court stated, Heikkila v. Barber, 345 U.S. 229, 231, 73 S.Ct. 603, 605, 97 L.Ed. 972, 976: "The spirit of these statements together with the broadly remedial purposes of the Act counsel a judicial attitude of hospitality towards the claim that § 10 greatly expanded the availability of judicial review * * *". The Court's purpose to apply the Administrative Procedure Act to reinvest in Courts the full power and responsibility of the Judiciary, Universal Camera Corporation v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, is reflected in Shaughnessy v. Pedreiro, 349 U.S. 48, 51, 52, 75 S.Ct. 591, 594, 99 L.Ed. 868, 873, declining to forbid judicial review under the 1952 Immigration Act, 8 U.S.C.A. § 1101 et seq.: "Such a restrictive construction * * * would run counter to § 10 and § 12 of the Administrative Procedure Act. Their purpose was to remove obstacles to judicial review of agency action * * *. It is more in harmony with the generous review provisions of the Administrative Procedure Act * * *." "Exemptions from the terms of the Administrative Procedure Act are not lightly to be presumed * *", Marcello v. Bonds, 349 U.S. 302, 310, 75 S.Ct. 757, 762, 99 L.Ed. 1107, 1116; Air Line Dispatchers Association v. National Mediation Board, 89 U.S.App.D.C. 24, 189

sequent efforts [13] of the Commission to indicate that it had in fact met the teachings of that case. This was not a permissible *nunc pro tunc* order correcting clerical, ministerial errors or omissions. It was an attempt to substitute reasons where none had appeared [14] or been recorded. Moreover, we agree with Long Island Railroad Co., supra, 140 F.Supp. 823, at page 828 (in which, at the very same time, March 1, 1956, a similar "corrected order" was entered), applying Amarillo-Borger, that in the face of positive, strong findings of probable illegality merely to restate the conclusion in negative form is inadequate. We do not regard this in a technical light at all. If administrative agencies, no matter how highly motivated their particular action may be, can, under the form of *nunc pro tunc* corrective orders, presumably "correct" the subject order to meet the objections specifically urged in a petition for judicial review, effective review would be denied. The vice of the "and good cause appearing" technique is that it affords nothing the parties or court can take hold of to scrutinize and measure as the basis for the action. That is compounded if, on a chal-

lenge, review is then thwarted by substituting something else. There is no way to tell whether, in the processes of deliberation and adjudication, the Division meant "and good cause appearing" to be the negative of the initial suspension findings or something different. Whatever it was, "these suitors were justly entitled to a recital of what it was that indicated the disappearance of the prima facie case, and the necessity for an investigation, namely, that the announced result was the exercise of a discretion based upon sound reasoning", Long Island Railroad Co., supra, 140 F. Supp. 823, at page 828.

The order of December 7, 1955, vacating the suspension must therefore be set aside, and the matter remanded to the Commission for further and not inconsistent proceedings. The question is not the simple one of a suspension beyond the statutory maximum of seven months (expired May 25, 1956) for this is all intertwined [15] with the Fourth Section Application. And rates which have been approved under the Fourth Section Application which would not, and could not, have been effectually deter-

F.2d 685, 688, 689; Ford v. United States, 5 Cir., 230 F.2d 533, 534.

13. On March 2, 1956, a "corrected order" of December 7, 1955, in I & S 6491 was entered, substituting for the "and good cause appearing" paragraph of that original order, note 7, supra, the following (numbers in [ ] corresponding to the initial stated reasons, see note 4, supra, are added):

"*It further appearing*, That consideration has been given to a petition by respondents, filed October 26, 1955, requesting vacation of the order of suspension, and of replies by [lists 5 protestants] thereto, and upon reconsideration of the previous action taken in this proceeding, we are reasonably satisfied that the said schedules if permitted to become effective would not [1] result in rates and charges, rules, regulations or practices which would be unjust and unreasonable, in violation of the Interstate Commerce Act or [2] constitute unfair and destructive competitive practices in contravention of the National Transportation Policy or [3] be in con-

travention of the provisions of section 4 of the Interstate Commerce Act; * *."

14. The Minute Entry, Division 2, Appellate Division, I & S 6491, December 7, 1955, merely states: "Voted to grant the petition to vacate the order of suspension but to continue the proceeding of investigation."

15. It is plain that all of the action was interdependent. E. g., the initial oral hearing October 17, 1955, was before a joint session of the Suspension and Fourth Section Boards; the Fourth Section Application was in abeyance as long as the rates were suspended; and the order of December 7, 1955, whether considered as impliedly finding the negative of reason [3] of the Suspension Order (note 4, supra) or expressly doing so by the "corrected order" of March 2, 1956 (note 13, supra) in holding that said schedules would not·" * * * be in contravention of the provisions of section 4 of the Interstate Commerce Act" was a statement patently wrong *unless* it was certain that such rates had been approved as a "special case" under 49 U.S.C.A. § 4.

mined so long as the rates were suspended, must resume their former status.

That leads us to the plaintiffs' further contention that under these circumstances the Order of December 9, 1955, approving the Fourth Section Application is invalid. In this they contend that *temporary* approval (i. e., pending a hearing) is not authorized by the statute and is hence ineffective. But this is a point we need not decide.

As in the case of suspensions, we are not at this time claiming or exercising the existence of a power to determine whether the proposed rates were a "special" case meriting approval. We are concerned with the narrower, but still important, question of whether the procedures thus far followed by the Commission are in accordance with law.

■ Assuming, *arguendo*, that temporary relief may be granted and that the "investigation" required by Section 4 to permit that temporary relief need not be the full dress adversary hearing required before final determination of the lawfulness of the proposed rates, we think there must be some de-

termination and disclosure of the basic reasons why temporary relief is granted. Unless this is done, there is no way for those immediately affected—e. g., "short haul" shippers who pay higher rates, intermediate communities, or competing carriers [16]—to ascertain whether action having a devastating potential is the product of reason and judgment within the mandate of the National Transportation Policy, 49 U.S.C.A. note preceding section 1 to "recognize and preserve the inherent advantages of each" mode of transportation and preserve a "national transportation system by water, highway, and rail * * * adequate to meet the needs of the commerce of the United States * * * " or is, on the other hand, hasty, ill-considered action creating undue and illegal preferences.

■ Nor is there any way for a Court on petition of any such interested and aggrieved parties to test its legality. So-called temporary approval is that in name only for, unlike suspensions which carry a statutory maximum, the Fourth Section approval may continue for many months or years until the investigation [17]

16. It would be unrealistic if, as claimed by the Railroads, competing carriers whose economic life is imperiled, Columbia Broadcasting System v. United States, supra; United States v. Storer Broadcasting Co., supra; Frozen Food Express v. United States, supra, have no standing to invoke review. They have ample standing, see note 12, supra; and at least two (see (2) and (3) of the criteria, Transcontinental Cases of 1922, 74 I.C.C. 48, 71, which applicants must affirmatively meet to satisfy the underlying requirement of a "reasonably compensatory" rate expressly deal with the affect on competitors: "In the light of these and similar considerations, we are of the opinion and find that in the administration of the fourth section the words 'reasonably compensatory' imply that a rate properly so described must (1) cover and more than cover the extra or additional expenses incurred in handling the traffic to which it applies; (2) be no lower than necessary to meet existing competition; (3) not to be so low as to threaten the extinction of legitimate competition by water carriers; and (4) not impose an undue burden on other traffic or jeop-

ardize the appropriate return on the value of carrier property generally, as contemplated in section 15a of the act. * * "

17. Hearings on the investigation ordered (and never rescinded) by the initial Suspension Order October 20, 1955, note 4, supra, were held early in 1956 and the matter is now awaiting an Examiner's proposed report. Control of timing and presentation at the various stages may be beyond the immediate parties since the matter was heard and is being considered on a consolidated record with cases of Steel Pipe—East to Southwest, Docket No. 31860 and FSA 31860. It may be further complicated since the proposed Fourth Section rates are constructed on the lowest barge and on-carrying motor truck tariffs, a substantial portion of which traffic now moves by motor carriers holding Oil Field Haulers' ICC permits so that, the plaintiffs assert, the ultimate action of the Commission in I & S 6491 may be affected by MCC 1891 General Investigation Oil Field Equipment, Materials, Supplies To and Between the Southwest, which likewise awaits Examiner's report. In either or

hearings are completed and judicial review exhausted. So far as the affected competing carriers are concerned, the approval is a definite, positive act having final characteristics, Phillips Petroleum Co. v. Federal Power Commission, supra; Atlantic Seaboard Corporation v. Federal Power Commission, supra, for even though the ultimate decision disapproves the rates and denies the Fourth Section Application, the traffic lost to them in the interim is irretrievable, and no means exists to recoup losses from shippers or the other carriers who have enjoyed the benefit of the Fourth Section rates.

■ This is in harmony with the philosophy of Section 4 that variations from its sweeping prohibitions are permitted, Intermountain Rate Cases, United States v. Atchison, T. & S. F. R. Co., 234 U.S. 476, 34 S.Ct. 986, 58 L.Ed. 1408, only in *special* cases, and then only after investigation affords the basis for a conclusion that it is "special." Before the Commission can permit that which the statute forbids, at least two things must be reflected: (1) that it is a "special" case, and this means something more than a label as such; and (2) that its classification as a special case has been determined by "an investigation"—a very important condition since, "The requirement of section 4 that such authorization shall be made, if at all, 'after investigation' clearly implies that the question shall be determined upon testimony and after a hearing", Louisville & N. R. Co. v. United States, D.C. W.D.Ky., 225 F. 571, 580, (three-Judge), affirmed 245 U.S. 463, 38 S.Ct. 141, 62 L.Ed. 400; and see note 12(c), supra. For administrative action permissible only under limited circumstances after satisfying statutory conditions, it is plain that this is the type of situation which Congress had in mind in requiring that "all decisions (including initial,

recommended, or tentative decisions) shall become part of the record and include a statement of (1) findings and conclusions, as well as the reasons or basis therefor, upon all the material issues of fact, law, or discretion presented on the record; * * *", Section 8, Administrative Procedure Act, 5 U.S. C.A. § 1007.

■ This is particularly so where, as here, by strong emphatic language condemning the rates for specific reasons (note 4, supra) and generally as violative of the criteria of Transcontinental Cases of 1922, note 16, supra, relief is first denied but, without any other or further showing, is then granted. Courts and administrative agencies have, and must have, power to change their minds. But if it is the rule of law which controls, there must be some basis to indicate that it is reason and judgment that has brought about the change.

■ All of this is aggravated by the fact that this serious question of whether competing water and motor carriers are to be exposed to what they describe as "suicidal" rates for the indefinite period of investigation, has been treated too much as a matter of pure paper form. When the verified complaint and supporting memorandum brief filed here pointed out that these protestants were entitled, 42 U.S.C.A. § 17(8), note 9, supra, to a stay of the order of December 9, 1955, (stated to have been issued by the Fourth Section Board, note 8, supra) until decision by Division 2, the Commission on March 2, 1956, "corrected" that to make it appear that this was by Division 2 acting as an appellate division. But since Division 2 could act only as an appellate division on a matter *appealed* to it for reconsideration, the Commission then entered, on April 27, 1956, a still further corrected order of December 16 stating, contrary to available record facts (note 6, supra) that

all of these proceedings, the rules permit exceptions and appeal to the appropriate Division followed by exceptions and Petition for Reconsideration to the Full Commission. The parties, on argument,

except to agree that the time would be substantial, were unable to estimate when the final order after final review would become final.

Division 2 was "acting as an appellate division, upon consideration of a petition by respondents [Railroads] requesting that the action of the Fourth Section Board in voting to withhold relief in Fourth Section Application No. 31120 * * * be reversed * * *."

The action of Division 2 was not appellate. It was initial. Pending decision on the petition for reconsideration of that action of December 9, the protestants were entitled to a stay. An order entered months after the judicial review has been set in motion and based on recitations not borne out by the available record does not change it. On the contrary, it dramatizes again the danger, under our system, of circumventing judicial review by claiming to find and then belatedly record that which was known in fact but imperfectly reflected in the official papers.

The orders appealed from are, therefore, invalid and for the reasons set forth are set aside and the matter remanded to the Commission for further and not inconsistent proceedings.

Reversed and remanded to the Commission.