The **NATIONAL SMALL SHIPMENTS TRAFFIC CONFERENCE, INC.;** Drug and Toilet Preparation Traffic Conference; Eastern Industrial Traffic League, Inc.; National Retail Merchants Association, Inc.; West Chemical Products, Inc.; and The Halsey W. Taylor Co., Plaintiffs,

and

Eastern Manufacturing Confectioners Traffic Association, The National Industrial Traffic League, and The Small Business Administration, Intervening Plaintiffs,

v.

UNITED STATES of America, and Interstate Commerce, Commission, Defendants,

and

Eastern Central Motor Carriers Association, Inc., Intervening Defendant.

No. 70 Civ. 1169.

United States District Court,
S. D. New York.

Dec. 23, 1970.

Arthur A. Arsham, New York City (Arsham & Keenan, New York City, of counsel), and Daniel J. Sweeney, Chicago, Ill. (Belnap, McCarthy, Spencer & Hardy, Chicago, Ill., of counsel), for plaintiffs.

Edward W. Hummers, Jr., Washington, D. C. (Fletcher, Heald, Rowell, Kenehan & Hildreth, Washington, D. C., of counsel), for intervening plaintiff Eastern Manufacturing Confectioners Traffic Assn.

John M. Cleary, Washington, D. C., for intervening plaintiff, National Industrial Traffic League.

George Edelstein, Washington, D. C. (Anthony G. Chase, Gen. Counsel, Eugene J. Davidson, Asst. Gen. Counsel, Donald W. Farrell, Associate Gen. Counsel, John E. Kolofolias, Attorney-Advisor, Small Business Administration, Washington, D. C., of counsel), for Small Business Administration.

George Edelstein, Washington, D. C. (Gregory B. Hovendon, and Lee A. Rau, Attys., Dept. of Justice, Washington, D. C., Walker B. Comegys, Acting Asst. Atty. Gen., Antitrust Division, Washington, D. C., and Whitney North Seymour, Jr., U. S. Atty., S.D.N.Y., of counsel), for defendant the United States.

Jerome E. Sharfman, I.C.C., Washington, D. C. (Fritz R. Kahn, Gen. Counsel, I.C.C., Washington, D. C., Robert W. Ginnane, U. S. Atty., New York City, of counsel), for defendant Interstate Commerce Commission.

Homer S. Carpenter, Washington, D. C. (Rice, Carpenter & Carraway, Washington, D. C., John R. Mahoney, Casey, Lane & Mittendorf, Washington, D. C., of counsel), for intervening defendant.

Before FRIENDLY, Circuit Judge, and MURPHY and LEVET, District Judges.

FRIENDLY, Circuit Judge:

The National Small Shipments Traffic Conference, Inc., and five other plaintiffs, joined by the Eastern Manufacturing Confectioners Traffic Association and the National Industrial Traffic League as intervenors, here ask us to invalidate an order of the Interstate Commerce Commission served on October 28, 1969, predicated on the Commission's report in Small Shipment Rate Revision— Eastern Central Territory. 335 I.C.C. 547. The United States, nominally a defendant, also attacks the report and order because of alleged adverse effects on small businesses, as does the Small Business Administration which was permitted to intervene. The report and order are

supported by the Commission and by Eastern Central Motor Carriers Association, Inc., (ECMCA) which filed the tariff here at issue. We shall refer to the two latter as the defendants and to the other parties as the plaintiffs.

## I

The report and order constitute the latest efforts to deal with what has become known as the small shipments problem. Its general nature was analyzed by the Commission almost 20 years ago in language which we quote in the margin.[1] As a result of the conditions there noted, the railroads almost abandoned the haulage of less-than-carload traffic. The motor carriers have been understandably unenthusiastic about the small shipments thereby thrust upon them, and the Commission has had to combat tariff restrictions designed to fend these off. See Restrictions on Service by Motor Common Carriers, 111 M.C.C. 151, 154–55 (1970). On the other hand, the Commission has been sympathetic to efforts by the motor carriers to make small shipments, characterized as those of 500 pounds and under, pay their way—properly so since any failure on that score would impose on larger shipments an unfair burden of higher rates which would handicap the motor carriers in competing for such traffic against rival forms of transport.

In establishing tariffs, the motor carriers, acting through their tariff associations, have long published elaborate classifications of commodities in an attempt to differentiate those commodities with average, favorable, and unfavorable transportation characteristics. Each commodity is thus assigned a classification, some 100, some below, some above. Broadly speaking the shipping rate was determined by multiplying the rate for carrying 100 pounds of class 100 traffic over an approximation of the distance (the "rate basis") by a percentage equal to the classification number. The charge would then be determined by applying this rate to the weight of the shipment.

One well-established and apparently generally accepted approach to recovering an appropriate share of the cost of handling small shipments involves the imposition of a minimum per shipment charge. This reflects the fact that any shipment, however small or easy to transport, entails an irreducible minimum of costs for platform handling, billing, and the like. Despite several increases in the minimum charge, ECMCA found this inadequate to deal with the small shipments problem, and in 1961 proposed,

1. In recent years the problems associated with the transportation of small shipments have become among the most troublesome and difficult of those with which the transport agencies and the Commission have to deal. From the standpoint of cost of service, a small shipment has always presented a special problem. This problem, so far as rates and charges are concerned, derives primarily from cost differences which lie principally in the terminal services. In large part, this situation is due to the fact that much of the cost of picking up, handling, and delivering a small shipment is independent of the weight of the shipment. Certain elements of the pickup and delivery cost, and a substantial part of the general office and terminal clerical cost, being independent of the weight of the shipment, are, therefore, several times as great, per 100 pounds, for a 100-pound shipment as for a 1,000-pound shipment. In addition to these differences in the nature of the pickup and delivery and clerical costs, small shipments require platform handling to a greater degree than shipments of larger size; i. e., the smaller the shipment the less opportunity to avoid platform handling at origin, and at intermediate, interchange, and destination points.

In the post-World War II period the problem associated with the transportation of small shipments has been intensified by reason of the fact that wage costs, which are direct costs, have increased more rapidly than other transportation costs. Increased wage costs have been particularly pronounced in the terminal service where the wage portion constitutes 65 to 80 percent, as contrasted with line-haul service where no more than 30 to 40 percent of the costs represent wage payments. I.C.C., 66th Ann.Rep., 59–60 (1952).

*inter alia,* a new scheme of charges for shipments less than 300 pounds.[2] These consisted of flat or "constant" charges, regardless of classification, for each of six 50-pound weight brackets, with per pound charges at a given rate basis decreasing as the weight bracket increased.[3] After suspending the proposed schedule of charges and rates and conducting an extensive investigation, the Commission allowed it to become effective on an experimental basis. General Increases–Eastern Central Territory, 316 I.C.C. 467 (1962). The experiment was abandoned first by a few of the larger carriers and then by all, before there was opportunity to evaluate its economic consequences or to test its legality.

The Eastern Central carriers returned to the Commission with a proposed restructuring of their rates and charges for the transportation of less-than-truckload and any-quantity shipments weighing less than 5,000 pounds; this would also have produced a 4% general revenue increase. The agency, however, disapproved the proposal. LTL COR Rates— Between East and Territories West, 326 I.C.C. 174 (1966). In June 1968 the carriers tried again, publishing a scale of flat charges up to 200 pounds, with a rate increase on shipments up to 1,000 pounds. When the Commission suspended the rates, the carriers withdrew the proposal and filed new schedules providing for a general percentage increase. However, they continued their studies of the cost of handling shipments in various weight brackets with a view to making new proposals that might be acceptable.

The tariff here at issue, ECMCA Tariff 500 I.C.C. No. MF–A–333 (generally referred to as Tariff 500), filed to become effective February 15, 1969, constituted an effort by the Eastern Central carriers to present the issue of tariff structure independently of revenue need. They assert—and this is not contested— that Tariff 500 would not significantly increase aggregate revenue. Its effect would be to leave substantially unchanged for shipments of 100 pounds and under the minimum per shipment charge previously in effect, to impose an increased set of charges and rates (as hereafter described) on shipments between 101 and 499 pounds, to leave unchanged the rates on shipments from 500 to 999 pounds, and to decrease the rates on shipments over 1000 pounds.[4] The professed desire of the carriers was the laudable one of establishing a schedule of charges and rates under which each category of traffic would bear its proper share of the transportation burden, so that hereafter any needed changes in revenue derived from this traffic could generally be obtained by percentage increases [5] or, if that happy day should ever come, decreases.

The scheme of Tariff 500 was as follows: [6] On shipments of 100 pounds or less, the minimum charge formerly applicable to all weight brackets is to continue with some minor modifications for the shorter hauls. Shipments between 101 and 200 pounds are divided into four brackets of 25 pounds each, and new flat charges are imposed with respect to each. These charges operate in the same man-

2. The territory embraced by the tariffs there and here at issue includes a considerably larger area than the name "Eastern Central" would imply. It covers shipments between and within New England, the mid-Atlantic states as far south as Virginia and West Virginia, the middle western states between the Ohio and the Mississippi, the two tiers of states west of the Mississippi, and the eastern half of New Mexico.

3. Thus, for an 800 mile haul, the charge in the 0–49 pound bracket was $6.41 whereas in the 250–299 pound bracket it was $11.31. The rates progressed up-

ward with distance although, in view of the high ratio of terminal to total costs, by no means proportionately so.

4. The reductions were 2% in the 1000–1999 pound bracket, 4% in the 2000–4999 pound bracket, and 7% for LTL shipments of 5000 pounds and over.

5. There have already been three such increases since March 22, 1970 when Tariff 500 first went into effect.

6. In the interest of simplification we omit certain special provisions concerning shipments from and to New England.

ner as a minimum charge since they apply, as do the charges in the 1–100 pound bracket, without regard to classification unless the class-determined rate would produce a higher charge, something that would happen only on articles rated higher than Class 100. In terms of per shipment charges, the result was a substantial increase in the 101–200 pound bracket. Between 201 and 499 pounds the structure is somewhat more complicated since in contrast to the rates and charges imposed on shipments weighing 200 pounds or less, some effect is given to favorable classification characteristics. Any shipment in this bracket, regardless of its class rating, is subject to the flat charge for the 176–200 pound category for the relevant "rate basis," as a minimum. A calculation on the basis of classification is then made to determine whether a higher rate should apply. Rates for class 100 and higher remain as they were previously. But for classes lower than 100, new class rate scales were constructed as follows: The Class 100 rate (stated in cents per cwt.) for the particular rate basis was divided into two parts. So much of that rate as was determined not to be related to density [7] remained constant, the classification ratio was applied to the balance, the two figures were then added, and the result was a new rate for the particular classification.[8] Thus, for a distance of 781–800 miles, the new Class 50 rate per 100 pounds for a shipment under 500 pounds would be $4.03 as compared with the Class 100 rate of $5.76,[9] though due to the minimum shipment charge of $11.55 for the 176–200 pound bracket the Class 50 Rate would not become effective until the shipment approached a weight of 300 pounds. The effect of this was to increase the rates for the 201–499 bracket as a whole and also, as shown by the example, to raise the percentage relationship of low rated articles to commodities in class 100 and above, although less drastically than in the 101–200 pound bracket where classification under Class 100 was abolished. In the 500–999 pound bracket nothing was changed. For shipments of 1000 pounds and over, classification continued to prevail but the basic rates were reduced, see fn. 4.

A table annexed as Appendix A to the Commission's report, 335 I.C.C. 579–81, which compares charges per shipment under the old and new schedules, enables one further to assess the effect of Tariff 500 on small shipments in general and on low rated articles in particular. We cite two examples: For the "rate basis" number 800, governing the New York-Chicago haul, the charge for shipments in the 151–175 pound bracket, which averaged 165 pounds, rose from $9.50 (calculated on the basis of the class rate, *i. e.,* $5.76 per cwt. x 165) to $10.70 (the new minimum charge for the 151–175 pound bracket) for Class 100 and from $8.14 to $10.70 for Class 70, an increase of 12.63% for the former and of 31.45% for the latter. For shipments in the 201–499 pound bracket, averaging 324 pounds, the rate on Class 100 remained unchanged but on Class 70 increased from $13.41 to $15.23, an increase of 13.57%, and on Class 50 from $9.82 to $13.06, an increase of 32.99%. This has the effect of changing the percentage relationship which average per shipment charges on articles in the latter classes bear to articles rated Class 100 from 71.86% to 81.62% and from 52.63% to 69.99%, respectively.

---

7. This comprised percentages of origin and destination costs determined in a study prepared by one of the carriers' cost experts, John C. McWilliams. He found the non-density related factor to be 82% for origin and destination service and 79% for interchange service, plus 100% of billing and collecting costs. In the 701–800 rate bases, for example, where the class 100 rates run from $5.4$1 to $5.76 per cwt., the non-density factor is $2.40.

8. In doing this $0.05 were deducted in order to keep the total increase in the 201–499 pound bracket down to 10%.

9. This result is reached by the following calculation: $5.76 (Class 100 Rate) *less* $2.40 (non-density factor) [= $3.36] *times* 50% (class rating as a percentage) [= $1.68] *plus* $2.40 (non-density factor) [= $4.08] *less* $0.05 (see footnote 8 *supra*) = $4.03 (new Class 50 Rate).

Tariff 500 raised a storm of protests. Acting under § 216(g) of the Interstate Commerce Act, Division 2 suspended the tariff until September 14, 1969, the limit permitted by the statute. Later the carriers voluntarily postponed the effective date until November 16. Exensive hearings were held. In addition to wide opposition from many originators of "small shipments" and their trade organizations, the tariff was challenged by the National Industrial Traffic League, whose members include shippers of all kinds, and by the Small Business Administration in pursuance of its responsibilities under § 8(b) (12) of the Small Business Act, 15 U.S.C. § 637(b) (12), to urge upon the Commission the mandate in § 2 (a) of that Act, 15 U.S.C. § 631(a). The complaints fell into two broad categories: Too great a burden was being placed on shipments in the 101–499 pound range, and classification principles were being ignored or greatly impaired.

In its report and order of October 28, 1969, Division 2 found "that the proposed new rates and charges, on LTL and any-quantity shipments, to apply generally between points in New England and Middle Atlantic territories, on the one hand, and, on the other, points in Central, Northwest, Middle West and Southwestern territories are just and reasonable and otherwise lawful," and ordered that the proceeding be discontinued. A petition for reconsideration by the full Commission was denied on February 3, 1970, and this action was commenced on March 20, 1970. Two days later, Tariff 500 became effective.

## II

■ Although none of the parties has challenged our jurisdiction under 28 U.S.C. § 1336, we must nevertheless consider this at the outset.

If the Commission, without conducting extensive hearings and making a finding that the particular proposed rates are "just and reasonable and otherwise lawful," 335 I.C.C. at 578, had simply discontinued the investigation after the statutory suspension period had expired, we would entertain serious doubt as to our power to review its action. The course of events, however, has been quite different. As indicated, the carriers here had filed a detailed schedule of new rates to which the shippers had made extremely specific objections. The Commission, pursuant to its authority under § 216(g) of the Act, suspended the proposed rate schedule for the full seven month statutory period and initiated an extensive investigation into the lawfulness of the new rates. Indeed, when it became apparent that the proceeding would continue beyond the seven month period, the Commission secured voluntary carrier consent to a further postponement of the effective date of the new tariff. Only after exhaustive hearings and consideration had eventuated in a finding that the rates are "just and reasonable and otherwise lawful" was the investigation terminated and the new schedule put into effect by the carriers.

The situation before us, then does not resemble the pattern in those cases in which courts have held that orders of the Commission discontinuing investigations in "general revenue proceedings" of rail carriers are not reviewable. Algoma Coal & Coke Co. v. United States, 11 F.Supp. 487 (E.D.Va.1935); Koppers Co. v. United States, 132 F.Supp. 159 (W.D.Pa.1955); Florida Citrus Comm'n v. United States, 144 F.Supp. 517 (N.D. Fla.1956), aff'd 352 U.S. 1021, 77 S.Ct. 589, 1 L.Ed.2d 595 (1957); Atlantic City Electric Co. v. United States, 306 F.Supp. 338 (S.D.N.Y.1969), judgment affirmed by an equally divided court 400 U.S. 73, 91 S.Ct. 259, 27 L.Ed.2d 212 along with Alabama Power Co. v. United States, 316 F.Supp. 337 (D.D.C.1969); Electronic Industries Ass'n v. United States, 310 F.Supp. 1286 (D.D.C.1970), appeal docketed as No. 423, 400 U.S. ——, 91 S. Ct. 1188, 27 L.Ed.2d —— (1970). In the general revenue cases the Commission does not approve specific rates as reasonable. Rather, it hands down permissive orders which do not purport to prescribe or decide the lawfulness of particular charges. Indeed, the Commission

often specifically indicates in such proceedings—as it did in the report challenged in the *Atlantic City Electric Company case, supra*—that its order does not "constitute a prescription of rates within the meaning of the decision in Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co., 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348" and that its "findings as to justness and reasonableness * * * will apply to the general bases of rates and charges, and will not preclude interested parties from bringing any maladjustments to our attention for correction." Ex Parte 259, Increased Freight Rates, 1968, 332 I.C.C. 714, 715, 792.

In other words, when increased rail rates are allowed to become effective as the result of a general revenue proceeding, shippers are left with the right to institute a reparations proceeding under §§ 13(1). and 15(1) of the Act and to get the Commission to decide at that time upon the lawfulness of the rates of which they complain. It is precisely the availability of this remedy before the Commission which most strongly argues against court review of a permissive general revenue order. And this same rationale applied in the case of Commission action which vacated—during the seven month statutory period—a suspension order with respect to rail, water or pipeline rates that had previously been imposed. See Amarillo-Borger Express, Inc. v. United States, 138 F.Supp. 411 (N.D.Texas 1956), judgment vacated as moot, 352 U.S. 1028, 77 S.Ct. 594, 1 L. Ed.2d 598 (1957) (limited reviewability of the vacating order); *accord,* Long Island R.R. v. United States, 140 F.Supp. 823 (E.D.N.Y.1956); Dixie Carriers, Inc. v. United States, 143 F.Supp. 844 (S.D.Texas 1956), judgment vacated as moot, 355 U.S. 179, 78 S.Ct. 258, 2 L.Ed. 2d 186 (1957); Atlantic Coast Line R.R. v. United States, 173 F.Supp. 871 (E.D. Va.1958). *Contra,* Freeport Sulphur Co. v. United States, 199 F.Supp. 913 (S.D. N.Y.1961) (the vacating of a suspension order is reviewable only on grounds of abuse of discretion); Oscar Mayer & Co. v. United States, 268 F.Supp. 977 (W.D.

Wis.1967); Naph-Sol Refining Co. v. United States, 269 F.Supp. 530 (W.D. Mich.1967). The orders in the cited cases were not the result of exhaustive hearings on the reasonableness of the proposed rates. More importantly, they —like general revenue orders—preserved the shipper's right to a full Commission hearing on the lawfulness of the new rates in a reparation proceeding. See, *e. g.,* Naph-Sol Refining Co., *supra.*

In our case, by contrast, the motor carriers' proposed tariff schedule has virtually nothing to do with revenue requirements, general or otherwise. Rather, it seeks to make specific revisions in the charges for varying weight categories so that each might more properly bear its own share of the transportation burden. Moreover, the Commission's report and order here was not at all preliminary in character. It followed upon a most detailed investigation and specifically finds that the particular rates are reasonable both absolutely and in relation to one another.

The conclusive character of this report and order is emphasized by the fact that—in contrast to the statutory scheme with regard to rail carriers—the Motor Carrier Act makes no provision for a reparation proceeding before the Commission. Hence, unlike a general revenue authorization for rail carriers or an order vacating a prior suspension of rail rates, the finding of "just and reasonable" contained in the report of October 28th is not readily susceptible of further challenge before the Commission itself. Of course, the shippers are not precluded from bringing a complaint sometime in the future under § 216(e), alleging that the Tariff 500 charges are unjust and unreasonable or at least will be so if applied from that time forward. However, such a proceeding would not re-examine the lawfulness of the rates at the time of the October 28, 1969, order. Hence, regardless of its outcome, it is unlikely under the *Arizona Grocery* doctrine that the findings in such a proceeding could serve as the basis for a judicial reparations action pursuant to §

204a(5) added to the Motor Carrier Act in 1965. Furthermore, as a practical matter, it is most improbable that the Commission—having just completed a lengthy § 216(g) investigation—would entertain a § 216(e) complaint or come up with significantly different findings in the immediate future. The report and order in this case are thus well within the ambit of reviewability recognized in Frozen Food Express v. United States, 351 U.S. 40, 76 S.Ct. 569, 100 L.Ed. 910 (1956), Abbott Laboratories v. Gardner, 387 U.S. 136, (1967), and Gardner v. Toilet Goods Ass'n, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967). What relief may be appropriate is a different question, which we will discuss at the conclusion of this opinion.

### III

The motor carriers sought to meet their burden of showing Tariff 500 to be just and reasonable, § 216(g), 49 U.S.C. § 316(g), primarily by an impressive revenue and expense study. Traffic data for 1967 were assembled for 42 carriers which accounted for 80% of the total revenue from traffic covered in Tariff 500. Sample freight bills were drawn by statistical procedures which the Commission permissibly found satisfactory.[10] Revenues were then adjusted to 1968 levels. Costs for 1968 were divided into the five items mentioned in the margin[11] and assigned to the various weight groups under principles approved by the Commission and generally not attacked by the plaintiffs. Operating ratios were then derived for the various weight groups under the existing and proposed rates. Under one method, called Appendix B, the costs of the 20

group 1 carriers were applied as a system to the traffic of all 42 carriers studied; under another, called Appendix D, the costs of each carrier were applied to its own traffic. The Commission found the former method "less acceptable," 335 I.C.C. at 569. The Appendix D method yielded the following operating ratios, 335 I.C.C. at 585:

OPERATING RATIOS

| Weight Bracket (Pounds Per Shipment) | Present Revenues | Proposed Revenues |
|---|---|---|
| 1–100 | 87.0 | 87.0 |
| 101–125 | 108.5 | 99.2 |
| 126–150 | 116.7 | 98.0 |
| 151–175 | 121.5 | 98.2 |
| 176–200 | 122.4 | 98.7 |
| 201–499 | 109.4 | 99.0 |
| Total 101–499 | 111.8 | 98.9 |
| Total 1–499 | 104.6 | 95.7 |
| 500 and over (LTL) | 93.7 | 97.1 |
| Total less-than-truckload | 97.1 | 96.7 |
| Truckload and volume | 90.4 | 90.4 |
| Grand Total | 95.0 | 94.7 |

This indicated that traffic in the 101–499 pound range was being carried at a loss under existing rates, whereas Tariff 500 would produce reasonable operating ratios, and constituted the principal basis for the Commission's conclusion that the carriers had sustained their burden of justifying higher charges for small shipments.

Plaintiffs mount two major attacks upon the Commission's approval of the carriers' cost studies. One relates to the treatment of so-called constant costs, the other to the inclusion of some non-study carriers' traffic which was handled interline with the study carriers. We reject the former but sustain the latter.

■ The Commission's Cost Section has long held the view not here attacked,

10. The shippers assailed the sampling technique employed by the carriers on the ground that the selection of freight bills was drawn on a systematic (e. g., every fourth or every eighth invoice) rather than a random basis. Such a procedure will not produce a biased sample, however, unless there are periodicities in the data, and the carriers' sampling experts

demonstrated through various randomness tests that there were no marked periodicities in the sample data. 335 I.C.C. at 566.

11. Pickup & Delivery at Origin and Destination; Pickup & Delivery at Interchange; Platform; Billing & Collecting; and Line Haul.

that 90% of the costs of motor carriers vary with the amount of traffic ("out-of-pocket" costs), whereas 10% are "constant." [12] Before the agency the shippers asserted that only out-of-pocket costs should be considered—a position not seriously pressed here and which the Commission properly rejected on the ground that in a proceeding concerned with the totality of traffic, no cost element could be properly neglected. They argued alternatively that constant costs should be allocated to the various weight groups by first dividing these between terminal costs (which were subdivided into billing & collecting, pickup & delivery, and platform) and line-haul costs on the respective ratios of such costs, and then assigning the former to shipments on the basis of total hundred weights and the latter on the basis of total hundred weight miles—a procedure sanctioned by the Commission's Cost Section for some purposes. The carriers urged that however appropriate this method might be in other types of proceedings, in a case whose aim was a proper distribution of the entire cost burden constant costs should be allocated as a percentage addition to the out-of-pocket costs determined by the studies for each weight bracket. The Commission upheld this position, 335 I.C.C. at 573–75.

While neither method of allocation is perfect, the Commission had a rational basis for sanctioning the carriers' decision to distribute constant costs by dollars rather than by physical units. As is pointed out, application of protestants' method would create absurd disparities in the additions to out-of-pocket costs for different weight groups, as shown in the margin.[13] We know of nothing in the nature of things or in recognized economic or accounting principles which dictates that those costs which comprise the 10% regarded as "constant" must inevitably be distributed on the basis of physical units rather than on the basis of expenses directly attributable to handling them. While plaintiffs may be right in saying that the Commission's determination sanctions a rate structure which more closely resembles one based on the assumption that all costs are variable—a position the carriers defended and the Commission rejected, 335 I.C.C. at 573—than it would were the cwt./cwt.-mile allocation employed, we see no reason to overturn the determination on that score. Indeed plaintiffs' cost analyst conceded that "[i]n the long run, over a twenty-five year period, all costs are out-of-pocket, all costs are a hundred percent related [to] traffic if we went a long enough period of time." And it has been said that "[i]n the motor-carrier industry * * * the long run is short in terms of calendar time, unlike the situation in industries which have difficulty in adjusting their plant and equipment to changes in the volume of output." Locklin, Economics of Transportation 648 (6th ed. 1966). In any event, a matter of this sort is peculiarly for the Commission to determine.

The other attack on the cost study is much more serious. The study included three types of traffic: (1) traffic which each of the 42 study carriers

---

12. These would include, for example, a portion of the costs for maintenance of plant and equipment, that part of depreciation which is not wholly a function of use, and "general expenses" such as the salaries of higher officials and the expenses of maintaining the general offices of the company. Cf. Locklin, Economics of Transportation 131–34 (6th ed. 1966). Unlike the railroads, however, the motor carriers are not shouldered with the direct responsibility of maintaining their own roads, which constitutes a significant element in the constant costs of the former. *Id.* at 132.

13. *Percentage Increases in Out-of-Pocket Cost by Allocating Constant Costs on Hundred Weight–Hundred Weight Mile Basis*

| | Under 500 pounds | T.L. |
|---|---|---|
| Pickup & Delivery | 2.7 | 33.9 |
| Platform | 4.7 | 58.5 |
| Billing & Collecting | 1.5 | 255.6 |

transported from origin to destination on its own line; (2) traffic which one study carrier originated and turned over to another carrier, whether a study carrier or not, for transportation to destination; and (3) the portion of non-study carriers' traffic which was received from or delivered to a study carrier. A cost analysis based on all three types of traffic was deemed to be made on a "through basis" since it included the complete haul on all traffic in which study carriers participated. This is to be distinguished from the "carried basis" which was limited to the study carriers' own haul, i. e., the first two categories noted above. Plaintiffs object that since interline traffic involves non-line-haul costs additional to those of single line traffic, apparently of the order of a 4–5% increase in operating ratio, inclusion of interline traffic—and the attendant interchange costs—of non-study carriers without including their single line traffic produces a general upward bias in the cost sample and a particular distortion with respect to small shipments, which are appropriately charged with a much higher proportion of non-line-haul than of line-haul costs. The proper method would thus have been either to include the single line traffic of the non-study carriers as well as their share of traffic handled interline with the study carriers or, since that was evidently impracticable, to confine the study to the traffic handled by the study carriers on their lines, the "carried basis." [14]

The Commission makes no real attempt to justify its approval of the "through basis", and ECMCA's defense of it hinges on a misstatement of the plaintiff's claim. The main argument of both defendants is that the error was harmless. The Commission presents a calculation from exhibits of record, on a

"carried basis", showing the following operating ratios:

OPERATING RATIOS

| Weight Bracket (Pounds Per Shipment) | Restated Present Revenues | Restated Proposed Revenues |
|---|---|---|
| 1–100 | 87.3% | 87.3% |
| 101–125 | 107.7 | 98.7 |
| 126–150 | 115.0 | 96.7 |
| 151–175 | 120.0 | 97.1 |
| 176–200 | 121.3 | 98.1 |
| 201–499 | 106.8 | 96.4 |
| 101–499 | 109.6 | 96.8 |
| 1–499 | 103.2 | 94.3 |
| 500–999 | 92.9 | 93.2 |
| 1000–1999 | 91.3 | 93.3 |
| 2000–4999 | 91.4 | 95.4 |
| 5000 and over | 88.4 | 94.6 |
| TL and Volume | 90.0 | 90.0 |
| All Traffic | 93.2 | 92.9 |

Since these figures also show unreasonably high operating ratios in the 101–499 pound bracket under the existing rates, although lower than those on which the Commission relied, and reasonable ones under the proposed charges, although again lower than those cited in the report, counsel for the Commission urges us to disregard its error as inconsequential.

We would have some trepidation in affirming an agency's decision on the basis of complex calculations made on brief although from exhibits of record, where its opponents have been afforded no opportunity to cross-examine or to rebut the calculations by testimony, see Davis & Randall, Inc. v. United States, 219 F. Supp. 673, 682 (W.D.N.Y.1963), even though they have done this on brief and at argument to good effect. However, we need not face that issue here, since other reasons require us to reject defendants' argument.

The first is that the defendants in attempting to plug one hole in their case have opened another. For the figures now presented to us on a "carried basis" are derived not from the Appendix D

14. We reject ECMCA's contention that this point is not properly before us because "[p]laintiff neither raised the argument nor submitted evidence in support of it during the course of the hearing." The National Small Shipments Conference clearly raised the point in its brief to the Commission, and the agency passed upon it, 335 I.C.C. at 570.

method, approved in the report, wherein each carrier's costs were compared with its revenues, but from the Appendix B method, mildly disapproved, wherein the costs of the 20 group 1 carriers as a system were applied to the traffic of all 42. To be sure, we should hardly have upset the Commission if it had been satisfied with the Appendix B method because, for example, data for a study like that made in Appendix D were unavailable or could be obtained only at great expense. But here the figures were available and it is apparent that the Commission was right in regarding the Appendix D method as a more accurate means of determining the operating ratios of the study carriers. Moreover, the differences in operating ratios between the Appendix B and Appendix D methods are by no means inconsequential; as the report states, 335 I.C.C. at 572, "a comparison of the results of [the appendix D] method with that for appendix B applications shown in columns 2 through 5 [of appendix C to the report, 335 I.C.C. at 583] reveals that the difference in the operating ratios for respondents' two methods, D versus B, range [sic] from 2 to 4 percentage points by weight bracket under 500 pounds." Adding this to the difference produced by substituting the carried for the through basis, plaintiffs come up with a 6% correction factor. On this basis, which does not seem unreasonable, the contrast between the operating ratios for small shipments relied on by the Commission and the proper ones is fairly striking:

OPERATING RATIOS

| Weight Group | Present | Proposed | Present | Proposed |
|---|---|---|---|---|
| | as per I.C.C. report p. 585 | | as corrected | |
| 1–499 lbs. | 104.6 | 95.7 | 98.6 | 89.7 |
| 201–499 lbs. | 109.4 | 99.0 | 103.4 | 93.0 |
| 101–499 lbs. | 111.8 | 98.9 | 105.8 | 92.9 |

While the corrected figures still indicate the need for increased revenues in the 101–499 pound brackets, one cannot be at all sure, in view of the Commission's general approval of a 95% operating

ratio for motor carriers of property with respect to traffic as a whole, see 335 I.C.C. at 576, that it would have sanctioned charges producing the substantially lower ratios on small shipments which emerge when the cast figures are predicated on both the "carried basis," as the source of the data, and the Appendix D method, as the basis of calculation. We have been admonished that "[t]he courts may not accept appellate counsel's *post hoc* rationalizations for agency action." Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962); NLRB v. Metropolitan Life Ins. Co., 380 U.S. 438, 443–444, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965). Although that generalization is not such an absolute as to require agency reconsideration when it is apparent that this "would be an idle and useless formality" since "[t]here is not the slightest uncertainty as to the outcome," NLRB v. Wyman-Gordon Co., 394 U.S. 759, 766–767 n. 6, 89 S.Ct. 1426, 1430, 22 L.Ed.2d 709 (1969) (plurality opinion of Mr. Justice Fortas), see also Communist Party of United States v. Subversive Activities Control Board, 367 U.S. 1, 66–67, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961), this is not such a case, for the reasons we have just elaborated.

IV

Although this error with respect to the cost studies would alone preclude our sustaining the report and order, it is desirable in light of probable further proceedings, also to consider plaintiffs' other major complaint. This is that Tariff 500 violates § 216(b) of the Interstate Commerce Act, which makes it the duty of every common carrier of property by motor vehicle "to establish, observe, and enforce just and reasonable rates, charges, and *classifications,* and just and reasonable regulations and practices relating thereto * * *" (emphasis supplied). The shippers assert that Tariff 500 abolishes all classifications below Class 100 in the brackets of 200 pounds and under, which it plainly

does,[15] and unreasonably alters the relationships which class-determined rates for classes under Class 100 bear to such rates for Class 100 and higher classes in the 201–499 pound bracket. The defendants respond, as stated by the Commission, "that the factor of classification, particularly density, has little significance upon the cost of transporting the smaller-weighted shipments," 335 I.C.C. at 550–51. They argue that, with respect to shipments of 200 pounds and under, Tariff 500 simply substitutes a sliding scale of minimum charges for the long prevailing single minimum per shipment charge, and that the changed relationships between 201 and 499 pounds merely reflect the impact of the minimum charge for the 176–200 pound weight bracket and the lack of correlation between density and cost in shipments of this size.

While both sides press All States Freight, Inc. v. New York, N. H. & H. R. R., 379 U.S. 343, 85 S.Ct. 419, 13 L.Ed. 2d 324 (1964), upon us, its precise holding, that the Commission had erred in determining that all-commodity rates established to meet competition violated § 1(6) of the Interstate Commerce Act, 49 U.S.C. § 1(6), the railroad equivalent of § 216(b), does not materially aid us. What is useful to us in that opinion is the discussion, 379 U.S. at 348–350, 85 S.Ct. 419, of the approach the Commission and Congress have taken to classification and the importance they have attached to it. As shown by analysis of the list of fifteen characteristics generally considered in determining the class to which a commodity should be assigned, 379 U.S. at 345 n. 2, 85 S.Ct. 419,[16] classification has served two major purposes, in addition to its practical utility, when used in conjunction with a class tariff, of making it "possible for carriers to publish reasonable charges for transporting all articles of commerce between all points in the United States without the necessity of publishing billions of separate and distinct rates," 316 I.C.C. at 483. The first twelve classification characteristics are related to cost and serve to make a fairer distribution of the total burden. The last three relate to the ability of the article to bear the charges. Sometimes these latter characteristics have been thought to justify a rate lower than cost and particularly a rate lower than fully distributed cost, since otherwise the article may not be able to move at all. Sometimes they have been thought to justify rates disproportionately high from a cost standpoint, a practice less elegantly called "charging what the traffic will bear," because such articles are in an economic position to contribute to the cost of transporting those which will move only at or even below cost.[17]

15. There is one exception to this generalization. When a shipment of 200 pounds or less includes both low- and high-rated commodities—i. e., if it is a so-called "mixed shipment"—the applicable class-determined charge is determined by separately calculating such charge for each category of goods shipped (applying the Class 50 Rate to all articles rated lower than Class 110). Of course, if the resulting charge is lower than the appropriate minimum charge for the weight bracket in question, the minimum charge will apply.

16. These are:
    1. Shipping weight per cubic foot.
    2. Liability to damage.
    3. Liability to damage other commodities with which it is transported.
    4. Perishability.

    5. Liability to spontaneous combustion or explosion.
    6. Susceptibility to theft.
    7. Value per pound in comparison with other articles.
    8. Ease or difficulty in loading or unloading.
    9. Stowability.
    10. Excessive weight.
    11. Excessive length.
    12. Care or attention necessary in loading and transporting.
    13. Trade conditions.
    14. Value of service.
    15. Competition with other commodities transported.

17. The rationale of the value-of-service concept was spendidly expressed in the Commission's First Annual Report, 30–31 (1887), quoted in 3–B Sharfman, The In-

We find little help in the parties' extensive debates whether the minimum per shipment charge was actually a departure from principles of classification,[18] whether § 216(b) permits a scale of minimum charges as distinguished from a single minimum charge and whether the charges in the 101–200 pound brackets can fairly be brought under that rubric. The same comment applies to their lengthy discussion whether the Commission was justified in relying on its earlier decision in the *Constant Charges* case, *supra*, 316 I.C.C. 467, and on a 1967 report of an Ad Hoc Committee of the Commission on the Small Shipments Problem. Of course the agency did not have to treat the problem at issue in this case as if it had never been considered before. More than sixty years ago the Supreme Court characterized the Commission as "a tribunal appointed by law and informed by experience." Illinois Central R. R. v. I. C. C., 206 U.S. 441, 454, 27 S.Ct. 700, 704, 51 L.Ed. 1128 (1907). On the other hand, the mere fact that the Commission had once made a ruling approving a scheme of charges containing some of the features of Tariff 500, which was not tested in the courts and under which little experience was accumulated, does not itself breathe vitality into the decision here.[19]

■■ What does emerge both from the language of § 216(b) and the history of the corresponding provision in Title I recounted by the Supreme Court in *All States* is that, when the Commission is dealing with the entire spectrum of freight shipments, rather than fixing or approving commodity rates it may not lawfully sanction the complete elimination of classification without sufficient reason for doing so. By the same token, once the Commission has recognized certain classifications to be fair and reasonable, it cannot lawfully sanction significant departures from them without adequate record support and reasoned explication.

The Supreme Court has emphasized that when an agency is departing "from prior norms", it is particularly important that it spell out the basis of its decision. Secretary of Agriculture of United States v. United States, 347 U.S. 645, 652–653, 74 S.Ct. 826, 98 L.Ed. 1015 (1954). In the report under review, the Commission dealt with the ultimate question raised by the shippers' challenge to Tariff 500's treatment of classification— whether there was substantial evidence to support the proposed changes—in a single and rather inconclusive sentence, 335 I.C.C. at 564:

The evidence here is persuasive that classification principles other than

ter-State Commerce Commission 425–26 (1936). The author also notes its limitations, *id.* at 427–44. See also the discussion of value of service by Judge Hincks in New York, N. H. & H. R. R. v. United States, 199 F.Supp. 635, 642–643 (D.Conn.1961), vacated, I.C.C. v. New York, N. H. & H. R. R., 372 U.S. 744, 83 S.Ct. 1038, 10 L.Ed.2d 108 (1963), and the criticism of this by Judge Smith in the district court decision in *All States*, 221 F.Supp. 370, 375–376 (D.Conn.1963), on which the Court found it unnecessary to pass, 379 U.S. at 355, 85 S.Ct. 419.

18. Plaintiffs argue that a true minimum charge, in contrast to the series of graduated minimum charges in Tariff 500, does reflect principles of classification since larger shipments of low-rated articles than of high-rated articles may be transported for a given minimum charge. The defendants respond by showing that

in many cases low-rated articles are transported for the same minimum charge as high-rated articles, thus ignoring the respective classifications. In essence, the plaintiffs are simply saying that the minimum charge is not also a maximum charge; the defendants are making the equally inconclusive point that a minimum charge has the effect of dispensing with classification within the range of its application. The question here, however, is not the extent to which classification principles have been abandoned in the past, but rather whether the abandonment of them in this case over a greater range of weights than previously was justified by the evidence.

19. We need not consider how far the Commission could utilize the record in *Constant Charges*, since there is no indication that it did.

weight lose much of their significance in connection with the movement of shipments weighing less than 200 pounds.

We call this inconclusive both because the phrase "much of their significance" is so indefinite and because the sentence does not deal at all with the altered relationships above 200 pounds. The Commission then supplemented this with a reference to its decision in *Constant Charges*. There, after posing the pertinent question, "Is weight such a predominant characteristic of all small shipments that other transportation characteristics of the articles shipped are of no material consequence?", the majority of the Commission returned a stronger negative than here, 316 I.C.C. at 484:

> We think it is clear beyond any reasonable doubt that the classification of a small shipment does not materially affect the carrier's cost of performing the service.

But little evidence was cited to support this resounding acclamation, and the jury was not unanimous. Commissioner Murphy thought that "such important and firmly implanted classification elements as density and value of the commodity" should not be disregarded, 316 I.C.C. at 487, and two other Commissioners agreed, *id.* at 489.

Plaintiffs pertinently and persistently ask what is the persuasive evidence to which the Commission alluded in the quoted sentence. Defendants point to the verified statements of witnesses Liipfert and McWilliams. Liipfert made the point that terminal expenses (billing and collecting, platform, and pickup and delivery) are an exceedingly large proportion (83.5% for the 1–200 weight brackets), of the total cost of small shipments and that the costs of many of the operations involved therein do not vary with the size of the shipment. However, he cited no particularly relevant statistics and did not assert that classification characteristics were wholly irrelevant with respect to such costs. McWilliams contributed somewhat more. He presented a study of the proportion of pickup and delivery costs that were not and were affected by density. At origin and destination, he found these to be 61.2% (not affected) and 38.8% (affected) for all traffic, but 82% and 18% for traffic in the 201–499 pound bracket. At interchange points, the figures of pickup and delivery costs were 68.8% (not affected) and 31.2% (affected) for all traffic, as contrasted with 79% and 21% for the 201–499 pound shipments.[20] Furthermore, as shown by the table in the margin [21] pickup and delivery costs comprised 53.6% of the total cost of handling small shipments for the 1–200 pound range, and billing and collecting, which is not affected either by density or other classification characteristics, amounted to another 16.3%. With respect to the other terminal expense item, platform handling, constituting 13.6% of total cost for shipments less than 200 pounds, while defendants concede the record contains no precise method for measuring the

---

**20.** For shipments in the lower ranges the percentage of costs not affected by density was higher.

**21.** PERCENTAGE OF TOTAL COSTS BY SERVICE CATEGORIES

| | | | | | Terminal | | | |
|---|---|---|---|---|---|---|---|---|
| Weight Brackets | Pickup & Delivery O&D | Interchange | Total | Platform | Billing & Collecting | Total Terminal | Line Haul | Total Costs |
| 1–100 | 52.4 | 5.2 | 57.6 | 10.7 | 19.2 | 87.5 | 12.5 | 100.0 |
| 101–125 | 47.4 | 5.3 | 52.7 | 14.4 | 15.6 | 82.7 | 17.3 | 100.0 |
| 126–150 | 45.7 | 4.8 | 50.5 | 15.9 | 13.9 | 80.3 | 19.7 | 100.0 |
| 151–175 | 43.3 | 5.2 | 48.5 | 17.3 | 12.9 | 78.7 | 21.3 | 100.0 |
| 176–200 | 41.1 | 5.2 | 46.3 | 18.5 | 11.9 | 76.7 | 23.3 | 100.0 |
| 1–200 | 48.4 | 5.2 | 53.6 | 13.6 | 16.3 | 83.5 | 16.5 | 100.0 |

effect of density, they point to evidence supporting a conclusion it would be small.

At most this evidence would have justified a conclusion that for shipments under 200 pounds perhaps as much as 75% of total costs were not affected by density. If density were the only factor to be considered, this is indeed so high a percentage that the agency might be justified on the basis of convenience in ignoring classification with respect to shipments of 200 pounds and less and surely would be justified in applying classification only to the portion of the rate for shipments in the 201–499 pound range that was not affected by density. What we miss in the Commission's reports, either in this case or in *Constant Charges,* is any explanation why classification principles other than density should totally be disregarded in the 101–200 pound bracket and largely so, under Class 100, in the 201–499 pound bracket.[22] Assuming that the Commission, on appropriate findings may choose to allow carriers to disregard the last three of the 15 recognized classification characteristics, see fn. 16, which are unrelated to costs, we do not understand why such matters as susceptibility to damage or theft, perishability, exposure to greater or less claims for loss and damage in proportion to weight, likelihood of damaging other articles, and ease or difficulty of carriage should not receive some reflection in a tariff applying to all shipments in a large section of the country. We recognize there comes a point where such refinements may properly be disregarded either on the principle of *de minimis* or because costs clearly unrelated to classification, such as billing and collecting, would be nearly as much as

the charge; that, we assume is the principal justification for the minimum charge.[23] We recognize also that precise costing of these other classification characteristics may be impracticable, and that, for this reason and others, exact equivalence of rates to costs is not required. Still the very existence of a classification not based solely on density,[24] the preservation of classification above Class 100 even for small shipments, and the full preservation of classification for shipments over 500 pounds show that the carriers and the Commission have been able to make some judgments about the effect of these and other characteristics on transportation costs. Hence, while there may be a surface plausibility to the Commission's essential contention that at some point all principles of classification merge and "a shipment becomes merely a shipment without distinguishing features by reason of the identity of the article shipped," 335 I.C. C. at 553, even were we to assume the major premise, the Commission has simply failed to provide us with sufficient evidence to justify the minor premise. Before sanctioning an abandonment of all classification factors under Class 100 with respect to shipments in the 101–200 pound range and an abandoment of all save density in the 201–499 pound range, the Commission should have provided more in the way of reasoned explication and should have had more in the way of evidentiary justification, even though this need not have achieved mathematical precision, than it did here. The Commission, in Mr. Justice Cardozo's oft-quoted phrase, has not explained its decision "with the simplicity and clearness through which a halting impression ripens into reasonable certitude. * * *

22. Indeed, Division 2's recent decision in Classification Ratings Based on Density, 337 I.C.C. 784, 805–806 (1970), which held that there was insubstantial evidence to support a classification scheme based on density alone for freight having a density of less than six pounds per cubic foot, would suggest the opposite.

23. For example, the minimum charge for a shipment of 100 pounds or under between New York and Chicago was $8.14 under the old rates for all classes up to class 100.

24. Classifications frequently vary according to the form of packaging and on whether the shipper agrees to accept a valuation less than actual value.

Something more precise is requisite in the quasi-jurisdictional findings of an administrative agency," United States v. Chicago, M., St. P. & P. R. R., 294 U.S. 499, 510–511, 55 S.Ct. 462, 467, 79 L.Ed. 1023 (1935).

V

We come finally to the appropriate remedy.

The complaint asks us to enter an order "annulling, setting aside, vacating, and permanently enjoining" the Commission's order. If plaintiffs mean by this that we are to enjoin continued application of Tariff 500, they are seeking something beyond our power to grant.

█ The tariff has already been suspended for the full period allowed by § 216(g), indeed even longer as a result of the carriers' agreement; and the rates were placed in effect as a result of the carriers' action, not the Commission's. If the Commission had simply failed to conclude its investigation before the end of the suspension period and the carriers had then placed Tariff 500 in effect, Arrow Transp. Co. v. Southern Ry., 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963), would clearly preclude us from enjoining application of the rates. We see no relevant difference with respect to our power to do this in the fact that the Commission here concluded its labors and found, although without adequate justification in our view, that the carriers had sustained their burden of showing the rates to be just and reasonable. In neither situation can we direct the Commission to reinstitute a suspension which has already continued as long as Congress allows. Several cases in which courts have directed suspensions to be reinstituted, see Amarillo-Borger Express, Inc. v. United States, 138 F.Supp. 411 (N.D.Tex.1956), judgment vacated

as moot, 352 U.S. 1028, 77 S.Ct. 594, 1 L.Ed.2d 598; Long Island R. R. v. United States, 140 F.Supp. 823 (E.D.N.Y. 1956); Atlantic Coast Line R. R. v. United States, 173 F.Supp. 871 (E.D.Va. 1958), are not to the contrary. In each of these, the Commission had vacated a suspension order during the seven month statutory period and without having conducted extensive hearings leading to a finding that the rates were or were not just and reasonable. Believing that the vacating orders were improperly made, the courts declared them void and issued injunctions against putting the tariffs into effect until the Commission's suspension order was properly vacated or the statutory period had run.[25]

On the other hand, 5 U.S.C. § 706(2) clearly allows us to set aside the finding in the report that the carriers have sustained their burden of showing the rates and charges under Tariff 500 to be just and reasonable. Such action does not, of course, mean that this court has determined the rates to be unjust or unreasonable. However, by annulling the Commission's finding, we open the way for aggrieved parties to file complaints under § 216(e) without the prejudice, if not outright bar, which an adverse § 216 (g) finding would present. If shippers should then prevail on the just and reasonable issue in a § 216(e) proceeding, they could not only secure the prescription of a lawful rate for the future but also use the Commission finding as the basis for a reparations action in court. See § 204a(5).

Moreover, we see no reason why we should not go beyond this and direct the Commission to resume the investigation of Tariff 500 with all practicable speed, unless the carriers should decide to supplant the tariff with another. Section 216(g) provides that even after a suspended rate has gone into effect, "the Commission may make such order with

25. In the *Long Island R. R.* case, the court did not issue an injunction, but merely continued a temporary stay order

against the new rates. This, of course, had the same effect.

reference thereto as would be proper in a proceeding instituted after it had become effective." The statute thus contemplates that a § 216(g) hearing may continue even after the new schedule has been put into effect. Since we believe the hearings on Tariff 500 were not properly concluded, we perceive nothing that forbids a reviewing court from directing the Commission to do now what it should have done in 1969, cf. Amarillo-Borger Express, Inc. v. United States, *supra*, 138 F.Supp. at 421.

If the parties wish to present additional evidence in the resumed investigation, including evidence concerning the effect of Tariff 500 in the period of its operation, the Commission should hear this. It might well be that even though the carriers have had three across-the-board percentage increases reflecting higher labor costs, the greater impact of such costs on terminal than on line-haul operations may offset the error in the previous cost study. Further evidence by the carriers and explanation by the Commission may justify the abolition of classifications under Class 100 in the 101–200 pound bracket and the dilution of such classifications in the 201–499 pound bracket. All this lies for the future. Our holding is the narrow one that the record and report are inadequate to support the Commission's conclusion that the carriers sustained their burden under § 216(g) of showing Tariff 500 to be just and reasonable.

We therefore vacate the Commission's determination that the rates and charges under Tariff 500 are just and reasonable and direct it to take further proceedings in a manner not inconsistent with this opinion. The Commission is directed to submit an appropriate order within fifteen days. Hopefully this may be done by agreement. Otherwise the Commission shall give notice of settlement to all other parties, who may submit comments or counter-orders within ten days thereafter.