**NATIONAL SMALL SHIPMENTS
TRAFFIC CONFERENCE, INC.,
et al., Petitioners,**

v.

**INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents.**

No. 78–1099.

United States Court of Appeals,
District of Columbia Circuit.

Argued 11 Sept. 1978.

Decided 26 Oct. 1978.

As Amended Dec. 29, 1978.

Daniel J. Sweeney, Steven J. Kalish, Washington, D. C., for petitioners.

Frederick W. Read, III, Associate Gen. Counsel, Washington, D. C., with whom Mark L. Evans, Gen. Counsel and Gerald B. Fleming, Atty., I. C. C., Washington, D. C., were on brief, for respondent, I. C. C.

Kenneth G. Caplan, Atty., I. C. C., Washington, D. C., entered an appearance, for respondent, I. C. C.

Robert Lewis Thompson and John J. Powers, III, Attys., Dept. of Justice, Washington, D. C., entered appearances for respondent, United States of America.

Before BAZELON, McGOWAN and WILKEY, Circuit Judges.

Opinion for the Court filed by WILKEY, Circuit Judge.

WILKEY, Circuit Judge:

Petitioners seek review of an order of the Interstate Commerce Commission [1] (Commission) which allegedly contradicts the mandate of this court issued upon earlier review of the case.[2] Because we agree with petitioners' principal allegations, we have set aside the order in question and have remanded for proceedings consistent with this opinion.

## I. BACKGROUND

In light of the relevance of the history of this controversy to the case's present posture, and because our previous memorandum opinion is unpublished, we set out in some detail the course of this litigation.

### A. *National Small Shipments I and the First Remand*

The controversy underlying this case arose from the 1969 filing of the so-called Tariff 500 [3] by the Eastern Central Motor Carriers Association, Inc. (Eastern Carriers). The novel structure of that tariff purported to allocate costs more fairly among individual shipments according to their weight.[4] It was believed that for

1. *Small Shipment Rate Revision-Eastern Central Territory*, Investigation and Suspension Docket No. M–22930 (9 December 1977), *reaff'd, Small Shipment Rate Revision-Eastern Central Territory*, Investigation and Suspension Docket No. M–22930 (30 August 1978).

2. *National Small Shipments Traffic Conference, Inc. v. ICC*, 184 U.S.App.D.C. 115, 564

F.2d 600 (1977) ("*National Small Shipments II*").

3. ECMCA Tariff 500, I.C.C. No. MF–A–333, filed to become effective 15 February 1969.

4. *See National Small Shipments Traffic Conference, Inc. v. United States*, 321 F.Supp. 500, 502 & n. 1 (S.D.N.Y.1970) (three-judge court)

some time the rates charged for heavier shipments effectively had been subsidizing the smaller shipments which were relatively costlier to handle; the tariff revision was predicated on the unexceptionable principle that each shipment should bear its "true" portion of the costs. Thus the rates for shipments weighing between 100 and 500 pounds were substantially increased and those for heavier shipments were reduced.[5]

The tariff revisions provoked innumerable protests, among which were those of petitioners in this case.[6] Pursuant to section 216(g) of the Interstate Commerce Act, the Commission suspended the tariff for seven months,[7] the maximum time permitted by the statute,[8] to permit inquiry into the lawfulness of the rates. Following extensive hearings, the Commission found the proposed tariff to be "just, reasonable, and otherwise lawful."[9]

Petitioners then brought suit in the District Court for the Southern District of New York seeking to have the Commission's order set aside. While the three-judge District Court was without power to enjoin application of the tariff,[10] it did set aside the finding in the Commission's report that the rates had been shown to be just and reasonable.[11] Of the grounds for reversing the finding of reasonableness, the material one here is the flaw in the methodology for figuring the proper allocation of costs. The District Court remanded the case with instructions to resume the investigation into the already effective tariff.

Upon remand, in order to shelter petitioners from the expense of an arguably unlaw-ful tariff, the Commission directed the Eastern Carriers either to cancel the tariff or to amend it to include a refund provision whereby shippers would be made whole in the event that the tariff were later found unlawful. The Eastern Carriers complied by cancelling the tariff.[12]

Despite the withdrawal of particular rates from controversy, the Commission maintained that the proceeding ·was not moot,[13] its still live purpose being the inquiry into the validity of certain rate-making principles. The Commission noted that from its inception the tariff proceeding had focused on just those dispositive questions of methodology and that future rate-making would depend on the outcome of its investigation.

At the resumed hearing, the Eastern Carriers buttressed their reliance on the suspect methodologies with certain assumptions alleged to "prove" that their statistics were unbiased.[14] As part of the defense of the altered rate structure, the carriers introduced a new study of the costs of handling shipments of various sizes at carriers' terminal platforms.[15] Previously platform costs had been allocated on the basis of average cost per hundredweight, without regard to shipment size. It was argued, however, that the prior practice was deficient insofar as it ignored the constant time or cost element incurred in the handling of *any* shipment. The carriers used the data from the platform study to calculate the allegedly higher platform costs per pound of the smaller shipments.

("*National Small Shipments I* "); *Small Shipment Rate Revision-Eastern Central Territory*, 350 I.C.C. 586, 587–88 (1975).

5.  See *National Small Shipments I*, 321 F.Supp. at 503.

6.  See *id.* at 505.

7.  *Id.* The carriers later voluntarily postponed the effective date until 16 November.

8.  49 U.S.C. § 316(g) (1970).

9.  *Small Shipment Rate Revision-Eastern Central Territory*, 335 I.C.C. 547 (1969).

10.  *National Small Shipments I*, 321 F.Supp. at 515.

11.  *Id.*

12.  See *Small Shipment Rate Revision-Eastern Central Territory*, 350 I.C.C. at 590.

13.  *Id.*

14.  *Id.* at 592–602.

15.  See *id.* at 602–18.

Following hearing, the Commission again concluded that the Eastern Carriers had validated their general cost allocation methodology,[16] and further that the platform study, although concededly flawed, was "clearly useful to the Commission, and its use [was] preferable to ignoring differentials in platform time and costs among various sizes of shipments."[17]

### B. *National Small Shipments II*

This court reviewed and vacated the Commission's order in September 1977.[18] It is our mandate in that case which petitioners allege the Commission has disregarded. In an unpublished memorandum accompanying our order in that case, we held that "there [was] not a sufficient evidentiary basis in the record to support the Commission's approval of the methodologies" underlying either the "through-basis" cost-revenue study or the platform study.[19] With respect to the platform study we observed that although it was ostensibly based on the "judgment of experts," there was nothing in the record which assured the representativeness of the rather thin "judgment sample," or for that matter established the expertise of the Commission staff conducting the study.[20] We concluded:

> On remand from this court, evidence should be adduced regarding the reliability and utility of the platform study in comparison with previous methods of computing platform costs. Petitioners should have the opportunity to rebut and test, through cross-examination if necessary, evidence proffered by ECMCA in support of the new study . . . [T]he facts at issue in this case lend themselves to resolution through adjudicative-type procedures. Such procedures have been

employed throughout the investigation. We see no reason why they should be abandoned here.[21]

We remanded the case with instructions that the "investigation and suspension proceedings be resumed in a manner not inconsistent" with our memorandum.

### C. *The Commission's Conduct on Remand from Small Shipments II*

It is the Commission's behavior since our order of 23 September 1977 which concerns us here. By order released 9 December 1977,[22] having conducted no further inquiry, the Commission (1) discontinued the proceeding to which we had remanded the case; (2) transferred the inquiry into the platform study's validity to another proceeding; and (3) announced that it would permit carriers to rely on the platform study in revising rate structures until the validity of the study was finally determined.[23] The stated reason for the discontinuance and transfer was that the discontinued proceeding was not a "proper vehicle" for the investigation inasmuch as its record was "quite stale" and Tariff 500 had been "long since cancelled."[24] Moreover, in the other docket "the parties ha[d] already introduced expert testimony and evidence relating to the validity of the platform study."[25]

Petitioners, understandably bemused by this apparent departure from our 23 September memorandum, filed a Freedom of Information Act request with the Commission, hoping to discover what had in fact occurred.[26] The disclosures which followed suggested that the content of the Commission's 9 December order might be explained by *ex parte* communications which had occurred between counsel for the Eastern

16. *Id.* at 618.

17. *Id.* at 614.

18. *See* note 2 *supra.*

19. *National Small Shipments II* slip op. at 1.

20. *See id.* at 10–11.

21. *Id.*

22. *Small Shipment Rate Revision-Eastern Central Territory*, Investigation and Suspension Docket No. M–22930 (9 December 1977).

23. *See id.*, J.A. at 92.

24. *See id.*, J.A. at 90.

25. *See id.*, J.A. at 91.

26. *See* Brief of Petitioners at 9–10.

Carriers and the Commission itself. It is apparent at least that there were *ex parte* contacts sometime between September and December and that they proposed essentially the disposition contained in the 9 December order. At no time, as was conceded by counsel for the Commission at oral argument, has the ICC denied that the content of its order was coincident with proposals made to it *ex parte* by counsel for the carriers. Moreover, references within Commission memoranda to extra-record statements made by representatives of the carriers leave little doubt as to the existence of the contacts.[27] Finally, it is apparent that resort to the "curative procedures" which preceded the Commission's 30 August order would hardly have been sensible if the petitioners' allegations had been fanciful.

In light of the evidence of *ex parte* contacts, petitioners requested that the Commission vacate its order,[28] making clear that the platform study would be unavailable as a basis for rate restructuring, and that it hold a hearing on the proper disposition of the discontinued proceeding. In response, the Commission invited written comments on the matter.[29] Finally, in a decision released 30 August 1978,[30] the Commission reaffirmed its order of the previous December, including the permissibility of the study's interim use. The Commission further opined that it had avoided prejudice from any *ex parte* communications through its review of all pertinent matters after submission of written comments by the parties.[31]

27. *See* J.A. at 112 (Memorandum of W. T. Bono, Chief of Cost Section); *id.* at 125–29 (Memorandum of General Counsel to Chairman O'Neal); *see also* Letter from Homer S. Carpenter to Chairman O'Neal, 30 March 1978, J.A. at 134–37.

28. *See* Letter from Daniel J. Sweeney to Chairman O'Neal, 21 March 1978, J.A. at 132–33.

29. *Small Shipment Rate Revision-Eastern Central Territory,* Investigation and Suspension Docket No. M–22930 (19 May 1978), J.A. at 138–39.

30. *Small Shipment Rate Revision-Eastern Central Territory,* Investigation and Suspension Docket No. M–22930 (9 December 1977).

## II. ANALYSIS

### A. *Justiciability*

■ The Commission objects to our review of that portion of its 9 December order which permits interim use of the platform study, on grounds that it is not a final order and is otherwise not ripe for judicial review.[32] We disagree. The precise question raised by petitioners is whether the order inviting interim use is consonant with our finding that the study was unsupported by a "sufficient evidentiary basis." Our review, therefore, is not a *de novo* inquiry into the reasonableness of permitting reliance on the platform study, but merely a clarification of the continuing effect of our prior mandate. We think the Commission has missed the crucial significance of the present posture of the case. We are unsympathetic to arguments that a case is unripe which would insulate from review plain contradictions of a court order.

If, as a substantive matter, the Commission's action is barred by our September order, the concreteness and immediacy of the instant controversy would be, we think, self-evident. The Commission's formal statement of its intention not to suspend rates predicated on the study threatens the petitioners with substantial and allegedly unlawful burdens.[33] It is evident that there are but two periods during which review of the Commission's conduct might be sought—either before or after the Commission has declined to suspend a rate which relies on the platform study. Of course, the decision whether or not to suspend a rate is itself not reviewable.[34] Thus the Commis-

31. *Id.,* slip op. at 12–13.

32. *See* Brief of ICC at 8–12.

33. *See* Brief of Petitioners at 13 n. *.

34. *See, e. g., National Small Shipments I,* 321 F.Supp. at 505–06, 515; *cf. Arrow Transportation Co. v. Southern Ry. Co.,* 372 U.S. 658, 662–67, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963); *Asphalt Roofing Mfg. Ass'n v. ICC,* 186 U.S. App.D.C. 1, 8–9, 567 F.2d 994, 1001–02 (1977). *But see Seaboard Allied Milling Corp. v. ICC,* 570 F.2d 1349 (8th Cir. 1978) (Commission decision not to investigate a proposed tariff is

sion contends that to avoid premature review, petitioners are remitted to filing a complaint under Section 216(e) of the Interstate Commerce Act,[35] attacking the lawfulness of a particular tariff already in effect. Even assuming that the petitioners' complaint against the Commission could be fashioned as an argument that the rate is "unjust or unreasonable," [36] it is unobvious what is gained by postponing review. Consequently, in light of the present fitness of the issues for judicial determination and the possibility that petitioners would be unprotected if remitted to a § 216(e) complaint proceeding, we take up the merits of petitioners' allegations.[37]

### B. Ex Parte Contacts

There is evidence in the record, uncontroverted by the Commission, of *ex parte* communications whose content was substantially that of the Commission's 9 December order. The communications occurred sometime prior to that order and after our order of 23 September. We had remanded the case for the Commission to conduct "adjudicative-type" proceedings "permitting the questions concerning the reliability of [the platform] study to be thoroughly aired." [38] We entertain no doubt that if the Commission had conducted the mandated proceedings and there was evidence of *ex parte* contacts as appear in this case, we would be unable to sustain any ensuing substantive order, at least without a further finding that no prejudice had resulted.[39] To be sure, the *ex parte* communications doctrine may not operate with identical rigor in all colorably adversarial contexts, but the adjudication contemplated in this case lies near the core described by the doctrine's rationales.

■■■ We have previously held that an investigation proceeding conducted under Section 216(g) of the Interstate Commerce Act is "informal rulemaking" [40] and consequently not governed by the hearing provisions of the Administrative Procedure Act.[41] Nevertheless, as is clear from this [42] and other cases,[43] the failure to fall within Sections 556 and 557 of the APA does not mean that the necessary procedures are confined to those provided in Section 553. The Interstate Commerce Act provides that the determination of a tariff's fairness is to be made "after hearing" [44] and typically an adjudicative form of proceeding has been followed. Moreover, we observed in our unpublished memorandum to the parties with respect to this controversy:

reviewable where a substantial issue of patent illegality has been presented).

**35.** 49 U.S.C. § 316(e) (1970).

**36.** *See* note 56 *infra.*

**37.** *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 149–56, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

**38.** *See National Small Shipments II,* slip op. at 10–11.

**39.** *See Home Box Office, Inc. v. FCC,* 185 U.S. App.D.C. 142, 191, 567 F.2d 9, 58 (1977) (rules affected by *ex parte* contacts to remain in effect pending inquiry into nature of the *ex parte* contacts).

**40.** *National Ass'n of Food Chains, Inc. v. ICC,* 175 U.S.App.D.C. 346, 351, 535 F.2d 1308, 1313 (1976).

**41.** Administrative Procedure Act, §§ 7, 8, 5 U.S.C. §§ 556, 557 (1976).

**42.** *National Small Shipments II,* slip op. at 2 n. 1.

**43.** *See, e. g., Mobil Oil Corp. v. FPC,* 157 U.S. App.D.C. 235, 483 F.2d 1238 (1973).

It is relevant for purposes of judicial review to identify the source of allegedly necessary procedures, for varying procedural minima will be entailed, depending on whether the due process clause, the APA, or a specific regulatory statute is being relied on. Choices of procedures more elaborate than are minimally required are of course within the discretion of the agency. *See Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc.,* 435 U.S. 519, 520, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

**44.** 49 U.S.C. § 316(g) (1970).

The issues which have crystallized in the course of this particular investigation are the kind which should be developed and resolved through some type of adjudicatory procedure. Indeed, this is what the Commission has done throughout the proceedings, and in this respect the investigation has been conducted properly.[45] Thus although Section 216(g) hearings are not required to be conducted in accordance with Sections 556 and 557 of the APA and the Commission "enjoys substantial flexibility to structure the hearings, it must provide depending on the nature of the case . . . , that freedom is not absolute."[46] The statutory requirement of a hearing, like the requirement of comment in notice and comment rulemaking, "imposes certain minimum constraints on the procedure followed by the agency."[47] One of those constraints is the disallowance of recourse to *ex parte* communications. Such contacts are offensive in two fundamental respects: (1) they violate the basic fairness of a hearing which ostensibly assures the public a right to participate in agency decisionmaking,[48] and (2) they foreclose effective judicial review of the agency's final decision.[49]

■ The question here is whether the Commission, having postponed a hearing on the merits and prescribed an "interim" substantive rule, is somehow immune from the rule against *ex parte* contacts. We conclude that it is not. If the primary controversy is of a sort to which the doctrine applies, it would be anomalous if *ex parte* contacts were permissible in fashioning an interim substantive ruling, especially where, as here, the underlying controversy is likely to become moot prior to a hearing on the merits.[50] This holding requires us to conclude neither that all interim relief must be preceded by an adversarial proceeding, nor that interlocutory orders arguably tainted by *ex parte* contacts are thereby made immediately reviewable. We hold only that having chosen to proceed as it did, the Commission was not permitted recourse to *ex parte* contacts.

On remand, in the context of the resumed hearing,[51] the Commission will have occasion to inquire into the nature and source of all *ex parte* communications had in this controversy and to assure that any material so communicated is subjected to adversarial review at the hearing.

## C. Interim Use of the Platform Study

Petitioners allege that the Commission is compelled, in light of our 23 September

---

45. *National Small Shipments II,* slip op. at 2 n. 1.

46. *United States Lines, Inc. v. Federal Maritime Comm'n,* 189 U.S.App.D.C. 361, 379, 584 F.2d 519, 537 (1978). We noted further in that case:
    In our decision today we have consistently recognized the freedom of the [agency] to structure its hearings as it finds appropriate. . . . Our prohibition of *ex parte* contacts is not based on our choice as to "which procedures are 'best' or most likely to further some vague, undefined public good." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* . . . 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460. Rather, it is based on the statutory requirements of a hearing before the [agency] and of judicial review under [a] . . . standard which Congress has chosen to impose.
    *Id.,* at 384 n. 63, 584 F.2d at 542 n. 63.

47. *Id.*

48. *See id.,* 189 U.S.App.D.C. at 381, 584 F.2d at 539; *Home Box Office, Inc.,* 185 U.S. App.D.C. at 189–190, 567 F.2d at 56–57; *Sangamon Valley Television Corp. v. United States,* 106 U.S.App.D.C. 30, 33, 269 F.2d 221, 224 (1959).

49. *United States Lines, Inc. v. Federal Maritime Comm'n,* 189 U.S.App.D.C. 361 at 383, 584 F.2d 519 at 541 (1978); *Home Box Office, Inc.,* 185 U.S.App.D.C. at 187–188, 567 F.2d at 54–55.

50. Although few controversies would not become moot for some reason given the pace at which the Commission is addressing this matter, we were told specifically in this case at oral argument that the Commission intends to complete a new platform study in 1979 to replace the one at issue here.

51. In light of the fact that the Commission's policy statement on interim use of the platform study is unlawful without regard to *ex parte* contacts, we have no occasion to consider whether the "curative procedures" undertaken by the Commission otherwise would have been sufficient to permit the Commission's orders to stand.

order, to reject any tariffs filed which rely on data from the platform study, until the study is validated at a further hearing. Thus the petitioners attack the Commission's statement of its intention to permit reliance on the study as contrary to our mandate and our finding that the study was without a "sufficient evidentiary basis."

The Commission has two responses to this objection. First, it argues that interim reliance on the study is a sensible "accommodation of a difficult problem as to which there is no completely satisfactory solution." The Commission continues:

> [T]he only currently available alternative to the platform study for allocating platform handling costs is distributing such costs as a constant expense per hundredweight, i. e., in direct proportion to weight. As the Commission pointed out, that alternative method has never been validated by any study and is not realistic because it fails to take into account the obvious fact that some carrier platform costs are not related to the weight of a shipment. . . . Allocation of platform costs by the constant expense per hundredweight manifestly results in an understatement of platform costs for lighter shipments and a corresponding overstatement of such costs for heavier shipments because it does not reflect those handling costs which are not related to the weight of shipments.[52]

This is, of course, a recital of the Commission's belief that, as a substantive matter, some platform cost adjustment is appropriate and the existing study is a rational, though imperfect way of figuring it. As elaborated below, *this statement is also precisely contrary to our finding that the evidence failed to warrant a departure from prior practice.* The Commission nonetheless seeks a dispensation to fashion an interim rule, believing that the rule would be sustained at a hearing on the merits. Whatever latitude the Commission ordinarily has in summarily providing interim relief to a party, it is much less free when rehearing a controversy which has already proceeded to the merits. The Commission may not simply pretend that judicial review has not occurred. *There having been no further inquiry into this case, whatever flaws originally precluded use of the study are unremedied and the study's interim use is indefensible in exactly the same sense as the Commission's prior order on the merits.*

The Commission's second argument depends not on its asserted freedom to fashion interim rules, but on an excessively parsimonious view of the legal effect of our finding that the study was unsupported by a "sufficient evidentiary basis." The Commission apparently reads our holding as somehow disapproving the record evidence but not the study itself.[53] To state the Commission's argument colloquially but not unfairly, it supposes that if through other proceedings it can escape the record in this case, it is otherwise free to allow use of the study. Specifically, the Commission argues that it is a critical distinction that it has not approved any rates, but merely is declining to disapprove them through its suspension power.[54] Conceding that the former would be barred by our September finding, the Commission is untroubled about passively remitting the shippers to complaint proceedings under section 216(e)[55] wherein they would have the burden of proving the unlawfulness of rates already in effect.

*The precise question then is whether it is unreasonable to let rates become effective which, if again tested in a context in which the carriers had the burden of proof, would not be sustained without more than was shown on the only extant record. We hold*

---

52. Brief of ICC at 14.

53. *See id.* at 14–15. ("The court's memorandum remanding the Eastern Central proceeding did not hold the platform study to be invalid but merely found that the evidence of record was insufficient to warrant the Commission's acceptance in that proceeding. The Court did not have before it the records in other proceedings which involve use of the platform study and, accordingly, did not rule on the acceptability of using the study in other proceedings.").

54. *See* Brief of ICC at 10.

55. 49 U.S.C. § 316(e) (1970).

*that it is.* To abandon the procedural framework within which the controversy has thus far proceeded—when the probable consequence of doing so would be to reverse the substantive effect of our 23 September order—is completely at odds with the nature of the dispute viewed in light of the structure of the Interstate Commerce Act.

When Tariff 500 was originally filed, the Commission found its novel cost allocation principles sufficiently suspect to warrant an inquiry via a section 216(g) investigation proceeding. Under section 216(g), the carriers had the burden of proving the reasonableness of their proposals. This was appropriate in light of the novelty and extent of the contemplated revision. The Commission would now excuse the burden which the carriers have twice failed to satisfy *following procedures reasonably thought by the Commission to be appropriate to the controversy.*

To shift the burden of proof at this time is objectionable in two respects. First, there being no suggestion that originally placing the burden on the carriers was in any sense unfair (the inference from the Commission's choice is the contrary), there is no rationale for shifting the burden which is consistent with our holding that the platform study was inadequately supported. Rather, to the extent the Commission's abstention permits the new rates to become effective and incidentally makes it procedurally more difficult for the shippers

to resist them, we think *the Commission disregards the only fair inference from our finding—that rates based on the platform study are not reasonable.*[56]

It bears reiteration that after extensive hearing, *the study was found unsupported by the record which the Commission thought was relevant for testing the study's validity.* Consequently, until such time as the study is validated, it is necessarily an arbitrary basis on which to figure tariffs, and its use is incompatible with the statutory obligations of both the carriers and the Commission to set rates that are just and reasonable. This was the plain holding of our 23 September order. To the extent that tariff filings purport to be justified by the study, they are facially arbitrary and it is a patent abuse of discretion not to reject them.[57]

Second, in the circumstances of this case, it would be unfair to the shippers now to remit them to a section 216(e) complaint remedy. Had the carriers sustained their burden, they would have been entitled to rely on that finding, and the reasonableness of their reliance would have been largely insulated from further review through either a section 216(e) complaint or a judicial reparations proceeding.[58] In fact, the finality of a general determination was the principal utility of continuing the section 216(g) proceeding after Tariff 500 was cancelled. To reverse now the burden of proof denies the shippers the protection of our finding which they would have had had the Com-

---

**56.** We contemplate that if a shipper, in the context of a section 216(e) complaint proceeding, were to show that a tariff was dependent on the platform study, the Commission would necessarily conclude that the tariff was arbitrary. It would then be necessary under section 216(e) for the Commission to prescribe a lawful rate on the basis of which a court could award reparations under 49 U.S.C. § 304a(5) (1970).

**57.** This injunction will apply as a matter of course to all parties or persons represented in the Eastern Central proceeding, whether the affected tariffs are filed in the Eastern Central Territory or elsewhere. The decision whether to reject tariffs based on the platform study

filed by carriers not parties or privies to the Eastern Central proceeding is for the Commission in the first instance, guided by the views expressed in this opinion.

Finally, the question may arise whether across-the-board general rate increases must be rejected, if applied to already effective tariffs which were themselves based on the platform study. We think not. .Whatever retroactive relief shippers may be afforded from already effective tariffs should be sought under section 216(e). *See* note 56 *supra.*

**58.** *See National Small Shipments I,* 321 F.Supp. at 506.

mission proceeded in a consistent manner. The image of repeated "bites at the cherry" without any mutuality of legal binding effect is not one favored by the law. In light of the fairer alternative which simple procedural consistency afforded, we conclude that the Commission acted arbitrarily.

■ In finding the Commission's action arbitrary, we are aware that a court must not "impose upon the agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good." [59] Accordingly, we have expressed no opinion as to the Commission's initial choice of procedures in this matter. We hold only that the Commission's freedom to vary among otherwise acceptable procedures within a single controversy is not unbridled. Where, as here, the consequence is evasion of the effect of our prior finding and unfairness to a party, the inconsistency must be set aside as arbitrary.

### D. The Discontinuance and Transfer of Proceedings

The correctness of that portion of the Commission's 9 December order which discontinued the original investigation has also been raised in this case. We set aside that ruling, without prejudice, however, to the Commission's discretion to arrange its proceedings on remand in any appropriate manner.

■ Initially, it is quite clear that the termination of the Eastern Central proceeding and the "transfer" of the platform study inquiry to the Central States proceeding were facially contrary to our 23 September order. Without more, however, this would not have undone the Commission's order in light of the agency's broad discretion to organize its own procedures. But the Commission failed not only to petition this court for a modification of our mandate, but also to give notice either to this court or the parties of its intentions. More worrisome is the likelihood that the transfer of the inquiry was merely a dilatory action, a "shell game" contrived through *ex parte* contacts to create an interim during which it would be arguably lawful to permit use of the study.[60] This regrettable scenario is further supported by the Commission's failure *more than one year after our remand* to resume the inquiry, even in the proceeding to which the inquiry was transferred ostensibly for just that reason. But this is a harsh inference whose plausibility it is not instantly necessary to determine. Its principal effect for our purposes is that it largely erodes our confidence in the ICC's procedural choices, especially in light of the weakness of their ostensible rationales.[61]

On remand, the Commission must resume the Eastern Central investigation proceeding as originally directed, unless another manner of proceeding appears to it appropriate, in which case it may petition this court for a modification of our order.

**59.** *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc.,* 435 U.S. 519, 549, 98 S.Ct. 1197, 1214, 55 L.Ed.2d 460 (1978).

**60.** We cannot be oblivious to this sequence of events: In 1974 the Central States proceeding record was closed, for the reason that the inquiry into the platform study could better be conducted in the Eastern Central proceeding, which had a more complete record on this issue. After the Commission and the carriers received from the three-judge District Court in New York an adverse opinion remanding the Eastern Central proceeding, the filed "Tariff 500" was withdrawn, although the Commission continued the platform study inquiry. After this court found the platform study unsubstantiated on the record and remanded the Eastern Central proceeding, the Commission then transferred the platform study inquiry into the

now reopened Central States proceeding, whose record had originally been closed because the Eastern Central proceeding afforded a better forum in which to consider the platform study.

**61.** In addition to the odd sequence of events in note 59 *supra,* the Commission's observation that Tariff 500 "has long since been cancelled," while true, is hardly of novel relevance. When initially declining to find the controversy moot after the tariff was cancelled, the Commission found that the cancellation left unaffected the usefulness of resolving the disputed ratemaking principles in the Eastern Central proceeding. We agreed with the Commission in September 1977, and we have not been informed of any subsequent events which should change either the Commission's or our appraisal.

## III. CONCLUSION

We cannot ignore the extraordinary sequence of events:

(1) Our order of September 1977 directed the Commission to adduce additional evidence and reconsider the platform study in the Eastern Central proceeding;

(2) The Commission has not only failed to do this, but

(3) Transferred the directed inquiry into the Central States proceeding,

(4) Which proceeding had previously been closed because it was a less appropriate vehicle for such inquiry than the Eastern Central proceeding, and

(5) The Commission has neither held a hearing nor taken any other action to carry out our mandate in the revived proceeding in over one year, while

(6) Accepting without objection or suspension new rates filed by carriers based on the platform study we held invalid in September 1977.

We have been presented in this case with a rather cheerless record of tardigrade agency action, discolored further by *ex parte* communications. The Commission's conduct is especially disquieting because its effect has been the evasion of an order of this court. The destruction that such irresponsibility threatens to the settled principles governing the relationship of agency and reviewing court is serious. The realization of the rule of law in regulatory fields depends often on a presumption of the substantive correctness of agency actions, but always on confidence in the basic fairness and integrity of the agency's processes. Injury has been done to that confidence. We expect that it will be repaired.

*Remanded for proceedings consistent with this opinion.*